UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

Nelda Kellom, as Personal Representative
of the Estate of Terrance Kellom, Deceased,
*et al.*,

      Plaintiffs,

v.                                      Case No. 17-11084

Mitchell Quinn, *et al.*,                Sean F. Cox
                                           United States District Court Judge

      Defendants.

_____/

## OPINION & ORDER
## ON DEFENDANTS' SUMMARY JUDGMENT MOTIONS

Terrance Kellom was shot and killed when a United States Marshal Detroit Fugitive

Apprehension Team was attempting to arrest him at a house in Detroit, Michigan on April 27,

2015. Thereafter, his Estate and his relatives filed this action, asserting multiple claims against

several Defendants. A number of claims have since been dismissed. Following the close of

discovery, Defendants filed summary judgment motions as to the remaining claims. The parties

have fully briefed the issues and the Court heard oral argument on May 2, 2019.

As explained below, the Court shall GRANT the City of Detroit Defendants' summary

judgment motion to the extent the Court rules that: 1) Defendants Eaton and Fitzgerald are

entitled to qualified immunity as to the *Bivens* excessive force claims asserted against them in

Count I; 2) the *Steagald* claims in Count VII are only cognizable as *Bivens* claims, not § 1983

claims, because the officers were acting under federal and not state law, and they only remain as

to the officers in their individual capacities; 3) Defendants Eaton and Fitzgerald (and Quinn) are

entitled to qualified immunity as to the *Steagald* claims asserted in Count VII; and 4) the *Monell* liability count, Count VIII, fails as a matter of law because there is no basis for imposing municipal liability in this action that has no viable § 1983 claims.

In addition, the Court shall GRANT the summary judgment motion filed by the United States because the Court concludes that it lacks subject matter jurisdiction over the Estate's Federal Tort Claims Act claims in this action.

Finally, the Court shall GRANT IN PART AND DENY IN PART the summary judgment motion filed by Defendant Quinn. The Court grants the motion to the extent that the Court rules that Defendant Quinn is entitled to qualified immunity as to the *Steagald* claims asserted by Kevin and Teria Kellom. The motion is DENIED as to the Estate's excessive force claim, asserted under *Bivens,* in Count I. As to that claim, construing the evidence in the light most favorable to Plaintiffs, there is a genuine issue of material fact as to whether Defendant Quinn committed a constitutional violation by virtue of having used excessive force. That claim shall proceed to a jury trial.

## BACKGROUND

On April 6, 2017, Plaintiff Nelda Kellom, as Personal Representative of the Estate of Terrance Kellom, Deceased ("the Estate"), filed this action. The Estate's original complaint named the following Defendants: 1) Immigration and Customs Enforcement Agent Mitchell Quinn; 2) Detroit Police Officer Darell Fitzgerald; and 3) Detroit Police Officer Treva Eaton. Plaintiff's original complaint included the following four counts: 1) "*Bivens* Claim" (Count I); 2) "42 U.S.C. § 1983 – Excessive Force and/or Unlawful Use of Deadly Force" (Count II); 3) "§ 1983 Conspiracy by Defendants" (Count III); and 4) "Wrongful Death [under] Michigan

Wrongful Death Act, Mich. Comp. Laws § 600.2922 *et seq*," (Count IV).

On April 16, 2018, Plaintiff's Counsel filed a motion seeking leave to file an amended complaint. Thereafter, Defendants filed responses indicating that, while they do not concede that the claims asserted against them are valid and that they may file motions challenging the claims asserted against them, they do not oppose the motion to amend. Thus, on May 3, 2018, the Court issued an order granting leave to file a First Amended Complaint.

On May 4, 2018, Plaintiff filed a First Amended Complaint which added named parties and claims. In addition to the Estate, seven of the Decedent's family members asserted claims in Plaintiffs' First Amended Complaint. Those "Non-Estate Plaintiffs" included: 1) the Decedent's mother in her individual capacity (Nelda Kellom); 2) the Decedent's father, Kevin Kellom; 3) the Decedent's two adult sisters (Teria Kellom and Lawanda Kellom) and his adult brother (Terrell Kellom); and 4) the Decedent's two minor children, joined in the lawsuit through their mother and personal representative, Janay Williams.

The First Amended Complaint included the following eight counts: 1) a *Bivens* excessive force claim (Count I); 2) a § 1983 excessive force claim (Count II); 3) a § 1985 conspiracy claim (Count III); 4) a *Bivens* conspiracy claim (Count IV); 5) a wrong death claim under Michigan law (Count V); 6) a claim for intentional infliction of emotional distress under Michigan law (Count VI); 7) a *Steagald* claim (Count VII); and 8) a § 1983 *Monell* liability claim (Count VIII).

The parties later agreed that the United States would be substituted for Defendants Eaton and Fitzgerald at to Counts V and VI. (*See* ECF No. 41).

In May of 2018, Defendants filed motions to dismiss. In an Opinion and Order issued on August 29, 2018, this Court: 1) dismissed Count VII against the United States because the

3

United States has not waived sovereign immunity as to alleged violations of the Constitution;  2) dismissed Counts V and VI without prejudice, as to the "Non-Estate Plaintiffs" because they failed to exhaust administrative remedies prior to filing Federal Tort Claims Act claims against the United States; 3) dismissed Count IV (the *Bivens* Conspiracy claim) because that claim is not cognizable as to the Estate, as the First Amended Complaint expressly alleges that the conspiracy began *after* the Decedent's death; 4) dismissed all "Non-Estate Plaintiffs" from all remaining counts, except Count VII, because they lack standing to assert those claims, because unlike the Estate they cannot assert a claim based on a violation of the Decedent's constitutional rights; 5) dismissed Counts II and VIII as to Eaton and Fitzgerald as Plaintiffs agreed that should be done; 6) dismissed Count III for failure to identify a racial or other class-based invidious or discriminatory animus underlying the alleged conspirators actions; 7) dismissed any claims asserted against Chief Craig in his individual capacity because the First Amended Complaint includes no allegations as to his personal involvement, and because Plaintiffs' Counsel stated during oral argument that no claims are brought against Craig in his individual capacity; and 8) dismissed Count VIII (the municipal liability claim) against officers Eaton and Fitzgerald because, as Plaintiffs' Counsel agreed during oral argument, there is no basis for a municipal liability claim against them.  (ECF No. 52).

Following the close of discovery, Defendants filed summary judgment motions as to the remaining claims in this action.

As to the City of Detroit Defendants, there are three counts that remain as to them:  1) the *Bivens* excessive force claim (Count I), asserted against Defendants Eaton and Fitzgerald; 2) the *Steagald* claims asserted by Kevin and Teria Kellom against Defendants Eaton and Fitzgerald

(Count VII); and the *Monell* liability count, asserted against Chief Craig and the City of Detroit (Count VIII). The pending motion seeks summary judgment as to all of those claims.

As to the United States, the following claims remain against it in this action: 1) the Estate's Wrongful Death claim under Michigan law (in place of Quinn, Eaton, and Fitzgerald); and 2) the Estate's Intentional Infliction of Emotional Distress claim under Michigan law (in place of Quinn, Eaton, and Fitzgerald). The United States seeks summary judgment in its favor as to both counts.

Finally, as to Defendant Quinn, the following claims remain against him: 1) the *Bivens* excessive force claim asserted in Count I; and 2) Kevin and Teria Kellom's *Steagald* claims in Count VII. Quinn filed his own summary judgment motion, seeking summary judgment in his favor as to both claims.

After the motions were fully[1] briefed by the parties, the Court heard oral argument on all three of the summary judgment motions on May 2, 2019.[2]

The following material facts are gleaned from the evidence submitted by the parties, *viewed in the light most favorable to Plaintiffs*, the non-moving party.

On April 27, 2015, the United States Marshals Service's Detroit Fugitive Apprehension Team ("DFAT"), including Immigration and Customs Enforcement Agent Mitchell Quinn

---

[1]Plaintiffs requested, and were granted, approximately 30 additional days to respond to the motions. (*See* ECF No. 87). Although Defendants filed briefs within the page limitations set forth by the local rules, the Court also allowed Plaintiffs to file briefs with an additional five pages for each of their three response briefs. (ECF No. 92).

[2]Prior to the hearing, the Court ordered counsel for the parties to be prepared to discuss two relevant cases at the hearing. (*See* ECF No. 109).

("Quinn"), and City of Detroit Police Officers Darell Fitzgerald ("Fitzgerald") and Treva Eaton

("Eaton") was conducting an investigation as to the whereabouts of Terrance Kellom. (Defs.' &

Pls.' Stmts. at ¶ 6). "Terrance Kellom was wanted on an arrest warrant for armed robbery and

for a weapons offense." (*Id*. at ¶ 7).

On the date of the incident, Terrance Kellom was 20 years old and weighed 145 pounds.

(Autopsy Report, Ex. B to Pls.' Br.).

Officers on the DFAT conducted an investigation, in order to locate Terrance Kellom.

Fitzgerald's Report of Investigation indicates that on April 27, 2015, he and other officers first

went to the Terry Street address in Detroit, Michigan that was listed on Terrance Kellom's

driver's license. (ECF No. 79-12). There, they spoke with a woman who stated that she was a

new tenant at that address, and that she had never seen or heard of Terrance Kellom.

Then, based on contacts that Terrance Kellom had while at a correctional facility, the

officers learned the name and address of Terrance's girlfriend, Janay Williams, who lived on

Princeton Street in Detroit. (*Id*.). While Fitzgerald was en route to that address, another team

member, Brian Behrend, advised that there was a black male fitting the description of Terrance

Kellom walking out the front door at the Princeton Street address, with an unknown black female

who was sweeping glass from around a green Impala. Once officers arrived there, they spoke

with Janay Williams and Adrienne Williams. Adrienne told the officers that Terrance Kellom

had broken the window to her vehicle and that Terrance might be staying with his father on

Evergreen. Janay made statements confirming that she was Terrance's girlfriend, and told the

officers that when Terrance left he was angry and told her he was going to burn her house down.

Janay, who the officers spoke with separately, told them that Terrance was staying with his

father on Evergreen.  Janay added that Terrance drove a four door Ford Taurus with a green sticker in the rear window.  (*Id*.).

Eaton then established surveillance at the home on Evergreen and advised the team that Terrance Kellom was seen entering and exiting the house and that his car was parked in the driveway.  (*Id*.).  Defendant Eaton continued surveilling the house on Evergreen, and saw Terrance Kellom enter the house again and remain inside.  (*Id*.; *see also* Eaton Dep. at 36-37).

The decision was made to approach the house in an attempt to make contact with Terrance Kellom.  (Behrend Decl. at 1).

The officers had an arrest warrant for Terrance Kellom but did not have a search warrant for the home on Evergreen Street.

Eaton testified that she believed that Terrance Kellom lived at the house on Evergreen and, therefore, the officers could enter the house because they had an arrest warrant for Terrance, who was inside the house:

> Q.     So for all intents and purposes when you went to the Evergreen address,
>        you thought that Mr. Kellom lived at that address?
> A.     Yes.
> Q.     So if you're armed with an arrest warrant and you believe that Mr. Kellom
>        lived at that address, did you believe that you don't need a search warrant?
>        MR. HELMS: Object to form.
>        MR. PADDISON: Foundation.
>        You can answer.
> A.     No.  We had filed an arrest warrant.
> . . . .
> Q.     You first surveilled, surveilled Terrance Kellom, correct?
> A.     Yes I saw him come out of the house.
> Q.     Okay.  And you saw him go back in the house; --
> A.     Yes.
> Q.     – is that correct?
>        Is there any reason why you didn't just sit there and wait until the judge or
> magistrate entered a search warrant?
>        MR. PADDISON: Objection, form, foundation.  You can answer.

A. There is no reason.
Q. (Continuing by MR. AYAD): Okay. And there was no reason because you believed he lived there?
A. Correct.

(Eaton Dep. at 35-36).

Terrance's father, Kevin Kellom, answered the door when the officers approached the

front door of the house on Evergreen.

### Kevin Kellom's Statement And Deposition Testimony Relating To Officers Entering His House

In an interview with police officers on April 27, 2015, the date of the incident, Kevin

Kellom testified as follows regarding the officers' entry into his house:

OFCR SANCHEZ:   Can you tell me what happened today at your house?

KEVIN KELLOM:   Me, my son, my fiancé, my daughter and my son-in-law was upstairs and we was talking.

OFCR SANCHEZ:   When you say your – your son and your fiancé, can you name who, who they were?

KEVIN KELLOM:   Okay. Me, Yvette Johnson, Terrance Kellom, Teria Kellom, Anthony Coleman and Vonnie. I don't know her last name.

      And we was upstairs and we was talking. And I see a dri – a car pull up in my driveway. I've got cameras on my house. I see a car pull up in my – a truck pull up in my driveway and almost hit my fence. . . .

      So I come downstairs. I look, I see some guys looking in my window. I saw the vest that said "Police." I'm thinking the police ain't got no business being at my house, you know, so I opened the door.

      He says, "Who all here with you?" And I started naming who all was here with me. *He break out and says, "Open the door."*

      *I said, "Open the door for what?" I said, "You got a search warrant?"*

      *He said, "Open your door, sir."*

      *I opened the door.*

. . . .

| | |
|---|---|
| OFCR SANCHEZ: | And how many did you see at that time? |
| KEVIN KELLOM: | It was one, two – it was three on the porch, it was two in front of the house and there was one right here on the side of the house. |
| OFCR SANCHEZ: | And you're saying all of them had police stuff, vests? |
| KEVIN KELLOM: | All of them had "Police" on, yes, yes. |
| OFCR SANCHEZ: | And at that time you said you answered the door? |
| KEVIN KELLOM: | I opened the door, yes. I answered the door. |
| OFCR SANCHEZ: | Is there two parts to your door or how many – |
| KEVIN KELLOM: | No. There's two. It's – no, one part. It's on the front door. I open the first door. |
| OFCR SANCHEZ: | Okay. |
| KEVIN KELLOM: | And I still had the screen door closed. |
| OFCR SANCHEZ: | All right. |
| KEVIN KELLOM: | *And he said, "Open your door."* <br> *I said, "Open my door for what?"* <br> *I said, "What's the problem? I said, "I didn't call the police."* <br> *And the other guy said, "Open the motherfucking door or I'm going to tear it down."* <br> I opened the door and I let them in. I ain't got nothing to hide from the police. I let them in. I mean my – |
| OFCR SANCHEZ: | Do you remember what they looked like? |
| KEVIN KELLOM: | It was – one of them was the guy who shot my son. |

(Defs.' Ex. 6 at 1-3; 10-11) (emphasis added).

During his September 14, 2018 deposition in this case, Kevin Kellom testified that he did

not give the officers consent to enter his home:

> Q. Before they entered the house did any of the officers ask for consent to enter your house?
> A. No. No.
> Q. They didn't even ask you?
> A. No. They kept asking me was Terrance there.
> Q. Did you ever tell them they could come in?
> A. No, of course not.

(Defs.' Ex. 7 at 25).

Kevin testified that he answered the door when the police arrived at the house. (Kevin

9

Kellom Dep. at 16-17). He testified that the officers indicated they were looking for Terrance.

Kevin testified that he asked the officers if they had a warrant and they responded that they had a

warrant to enter the house.  Kevin testified that he asked to see it and then he and the officers

argued back and forth.  Kevin testified that an officer "snatched" the door open and the officers

entered and went up stairs.  (*Id*. at 18-21).

**Agent Quinn's Deposition Testimony Regarding His Entry Into The House**

Quinn's motion asserts that other officers entered the house before he did and that he

only entered the house after he heard a call for backup.  During his deposition in this case, Quinn

testified as follows:

> Q.    There came a time that you went in to the house; is that correct?
> A.    Only after I was called in to the house, after the other officers had already
>       entered the home.
> Q.    What were you called?  How were you called to enter the home?
> A.    Via radio, Mr. Kellom had been found hiding on the second floor of the
>       home in an attic, a crawl space.
> Q.    Okay.  Well, who called you and what did they say on the radio?
> A.    I cannot recall what was said on the radio.  Assistance was asked and the
>       other officer was asked to come into the home, because the subject was
>       being noncompliant, making threats.
> Q.    You don't know who called, though?
> A.    If I had to assume, I want to say, it was Officer Baron. I'm not for certain.
> Q.    Okay.  And you were called to provide assistance?
> A.    Yes.
> Q.    *What – you know, in your law enforcement wordage, what does*
>       *"assistance" mean?*
> A.    *Assistance could mean anything.  You could provide medical assistance.*
>       *You could provide support for someone that's hostile. Assistance is*
>       *anything.*
> . . . .
> Q.    Okay.  That's what I wanted to get to.  Thank you.
>       So, you heard over the radio that you needed – that someone needed
>       assistance, correct, sir?
> A.    No.  What I heard over the radio was somebody requesting an additional
>       body.  They asked for another person.
> Q.    Well, then please tell me exactly what you heard, because I thought, you

said, you heard that they needed assistance.

A.    Sir, exactly what I told you was that I can't recall what was said over the radio.
      *What was asked for – what our – what I remember is they asked for another person. They asked for another body. Asking for another body, another person, you are requesting assistance in asking for an additional body or another person.*

Q.    I want to know exactly how you heard it; now how transcribed (sic) – What exactly did you hear over the radio?

MR. TOOMEY: Objection, asked and answered.

THE WITNESS: I cannot tell you what was exactly said over the radio. What I can tell you is they asked for an additional person for assistance.

. . . .

Q.    So, your answer is you don't know exactly what was said, but you understood it that you needed another person or assistance in that situation; is that a correct statement?

A.    Yes.

Q.    Okay. Thank you.
      What did you do then, Agent Quinn, right immediately after that?

A.    Proceeded in to the house.

Q.    When you proceeded in to the house, did you think that this was a situation that could be hostile?

A.    Any situation that you dealing with in law enforcement has the potential to be hostile. You have to take every situation seriously.

(Quinn Dep. at 87-93). Later, while examined by his own counsel, Quinn testified as follows:

Q.    At some point, there was a request for backup while you were still outside?

A.    Yes.

Q.    And I can't remember – Can you recall who made that request?

A.    Not offhand. I know Deputy Baron was the one that was engaging with Mr. Kellom. Adam, it may have been him.

Q.    I think, you said, you can't recall whether you heard it over the radio?

A.    Everything is broadcast over the radio. Going back to his objection, when the floors are being cleared in a home, it's broadcast over the radio. The level three is clear. Level two is clear. Moving to his level, going here, all that information is broadcast over the radio, so, we know where people's relative location is inside of the home. Once they got up to the second floor of the house, it was called out that he was found in the attic.

Q.    "He" being Mr. Kellom?

A.    Mr. Kellom.

Q.    When the request for backup was made, what tone of voice was the person using?

A.      It was an excited voice.  I mean, "We need somebody else in here!"  *And later on, I discovered, I do not recall if it was going into the house or once I got in the house* that Mr. Kellom was claiming he had a weapon.

(Quinn Dep. at 145-46) (emphasis added).

**Kevin Kellom's April 27, 2015 Interview Regarding The Shooting**

On the date of the incident, Kevin Kellom was interviewed.  (Defs.' Ex. 6).  During that interview, Kevin Kellom stated that a few officers initially entered the house and went upstairs looking for Terrance, while Kevin remained on the main floor.  He said the events leading to the shooting unfolded very quickly.  (*Id.* at 54-55). He said that he heard commotion coming from upstairs, hearing things like "show me your hands motherfucker," "freeze mother fucker," etc. More officers then entered the house, including the officer who ultimately shot his son, who quickly ran upstairs.  Kevin heard what he thought was officers coming down the stairs with his son.  (*Id.* at 40, "I just heard them coming down the stairs" and 42; *Id.* at 39 "All I know is that somehow they got from upstairs, downstairs . . . ").  Then Terrance and some officers were in the hallway on the main floor, while Kevin was in the dining room with an officer.  Terrance called out for his father and reached for him.  Kevin heard a pop, pop, pop, as shots were fired.  Kevin saw the shots strike Terrance, and saw his body jerk.  Terrance backed up as he was shot.  Terrance fell to his knees. More shots were fired after that. Kevin stated that Terrance did not have anything in his hands when he was shot and that his hands were upwards and open.  (*Id*. at 27-28 & 37).  After the shooting, Kevin heard a female officer say out loud, "Why did he shoot? Why did he shoot him?"  (*Id*. at 47).

**Kevin Kellom's September 14, 2018 Deposition Testimony Regarding The Shooting**

Kevin Kellom was deposed in this action on September 14, 2018 – more than three years

after the shooting.  Kevin testified that officers entered the house and two went upstairs looking

for Terrance.  (Kevin Kellom Dep. at 26).  Kevin again testified that the events unfolded very

quickly.  (*Id*. at 57).  Kevin heard commotion coming from upstairs, things like "freeze mother

fucker."  (*Id*. at 27-28).  Kevin testified that he heard officers bringing Terrance down the stairs:

> Q.    At this point in time you can't see anything you are hearing things?
> A.    Yeah, I'm hearing the intensity coming downstairs like bumping, you
>        know like bumping.
>
> . . . .
> Q.    Can I stop you there? While your son is on the stairs with the officers –
> A.    Bringing him downstairs.
> Q.    – can any nonofficer see him on the stairs?
> A.    It was two officers in front and two officers in back of him that was
>        bringing him down.
> Q.    How do you know that?
> A.    Because when they came downstairs and the shooting started two of the
>        officers ducked off into those two back bedrooms right there and one
>        officer ducked off in the bedroom.
> Q.    Could your daughter or Fonnie see Terrance as he was on the stairs?
> A.    Yes. We all saw him when they brought him down the stairs.
> Q.    No.  I'm asking while he's still on the stairs.
> A.    *No, No. No one could see him on the stairs because we as like the way my*
>        *stairs is there's a hallway and then my stairs, the living room and the*
>        *dining room (indicating).  Can no one see nobody on the stairs.*
> Q.    *Were you able to see your son when he first left the stairs and entered the*
>        *hallway?*
> A.    *Yes. Yes.*

(*Id.* at 29-30) (emphasis added).   But at another point during his deposition, Kevin testified that

he saw his son walking down the stairs.  (*Id*. at 107).

Kevin testified that Terrance's hands were free and that while Terrance was cussing at

the officers, he was not struggling or resisting.  (*Id*. at 31).  Kevin told his son to "lay it on

down" (ie., go with the officers).  His son shrugged his shoulders and said "but dad," when

Kevin suddenly heard the "pop, pop, pop" of shots ring out. (*Id*. at 33).  Kevin testified that

Terrance was in the hallway and Kevin was still in the dining room when the shooting occurred. Kevin testified that Terrance's hands were upwards and out when he was shot and that Terrance had nothing in hands. (*Id*. at 39-40 & 99 &100). His son fell to his knees and more shots were fired.

Although he did not include such a statement during his interview on the day of the incident, Kevin testified that Terrance was shot from point-blank range as the last shot:

> Q.    What I'm trying to figure out was he still in this hallway or has he entered the living room?
> A.    No. He's in the hallway. He never got a chance to enter the living room. My son died in the hallway.
> Q.    It was only one shooter?
> A.    Yes.
> Q.    The shots that the officer fired when your son was on his knees, were those the last shots fired?
> A.    No.
> Q.    So what happens next?
> A.    He had one more – my son was laying on the floor as if he was trying to crawl. The officer put his boot to his shoulder and he says, freeze, I said freeze mother fucker, and shot one more time. That one hit I don't know maybe, I can't say exactly what side, but the bullet hole in back shoulders, that's the last time I saw him shoot.
> Q.    Your son is –
> A.    Lying on the ground.
> Q.    – now lying on the ground face down?
> A.    Yes, sir.
> Q.    And he's trying to crawl?
> A.    He's like on his stomach like daddy, daddy, and spitting up blood. He put his boot on his shoulder and he says I said freeze mother fucker, pow, that was it.

(Kevin Kellom Dep. at 42-43).

Kevin testified that, after the shooting, a female officer on the scene asked out loud, "why did you even fucking shoot?" and the shooter did not respond. (*Id.* at 52).

Kevin testified that the hammer photographed at the scene had not been in the house and

he does not know how it got in the house.  (*Id*. at 56).

**Summary Of Quinn's Testimony Regarding Shooting**

The DFAT officers testified that Terrance was located hiding in the second floor attic crawl space and refused to come out peacefully, shouting things like "shoot me, bitch," "I have a gun," and "You're gonna have to kill me."  Defendants contend that Terrance had a hammer and was tearing a hole through the attic floor, so that he could escape from the attic crawl space by going through that hole and dropping down onto the main floor.  They claim that Quinn descended the stairs, hoping to catch Terrance where he would land on the first floor.  (Defs.' Br. at 9).  Quinn testified that Terrance came out of the back, left bedroom, that had a blanket draped where a door would normally be, holding a hammer and approaching him aggressively. Quinn ordered Terrance to drop the hammer but he did not comply.  Quinn testified he shot Terrance once or twice, to protect himself and fellow officers, hoping that Terrance would stop coming towards him.  Quinn testified that Terrance kept advancing towards him, making him question whether he was hitting him with his shots because he did not stop.  (Quinn Dep. at 111-16).

**Defendant Fitzgerald's Report And Deposition Testimony**

Defendant Fitzgerald's Report of Investigation included the following narrative regarding the shooting:

> After several minutes I could hear loud banging coming from upstairs and Mr. [Kevin] Kellom is starting to get physical with me.  TFO Brian Behrend then stated "he's going through the floor, be advised he going through the floor."  At that point, *I observed TFO Mitchell Quinn start walking toward the narrow hallway but quickly stop.  When I turned around towards the hallway I could see Terrance with a hammer raised above his shoulder and I believed he was about to strike myself and TFO Quinn.  I then saw TFO Mitchell Quinn reach for his duty weapon, drawing it from his holster while Terrance was quickly advancing towards TFO Mitchell Quinn and rapidly closing the space between them with hammer in right hand raised above head.*  I pushed Mr. [Kevin] Kellom to the

ground while drawing my department weapon when *I observe TFO Mitchell Quinn fired one shot at Terrance. At the time TFO Quinn shot Terrance was approximately 7FT away and still closing the distance between them.* Mr. [Kevin] Kellom and the others inside the living room went to the ground after hearing the gun shot. *I observed TFO Mitchell Quinn fired several more shots at Terrance while TFO Quinn was falling backwards away from Terrance who was then an arms lenght [sic] away. At that time I saw Terrance fall to his knees then fall face down with hammer still in right hand.*

(ECF No. 77-5 at PageID959-60) (emphasis added).

Defendant Fitzgerald was deposed in this action on November 26, 2018. Fitzgerald testified as follows regarding the shooting:

Q. Okay. Did there come a time where you seen Terrance Kellom?
A. Yes, there was.
Q. Okay. When was that, sir?
A. *That was after first couple of shots. That's when I saw him.*
. . . .
Q. So you, you hear a couple shots? I'm sorry, I'm not trying to put words in your mouth, but you heard a couple shots first and then you seen Terrance Kellom?
A. Yes.
. . . .
Q. So when you first seen him where were you standing, Officer Fitzgerald?
A. When I first saw – you got the, the diagram?
Q. Yes, sir. And I'm going to show you the – it's number six on the deposition of Ms. – Officer Eaton but we can use it as well here too.
A. Where's the front door. Oh, right here. I saw – I finally saw Terrance when he was on his knees almost in the front of the, the door, door frame here – witness indicating –
. . . .
Q. Okay. And when you first observed Terrance Kellom, was he still standing, was he on his knees; what, what did you observe?
A. *He was on his knees when I saw him.*
Q. Okay. And when he was on his knees, *did you see him holding anything?*
A. *No, I did not.*
Q. And did you see him fall forward?
A. Yes.
Q. To the ground?
A. Yes, I did.
Q. Okay. *Now after you seen him fall forward to the ground did you see anything in his hands then?*

A.    *No, I didn't.*
Q.    *Or anything near his hand?*
A.    *No.*
Q.    *So I want to take you to again your statement of Exhibit F-2. Did you ever see Terrance Kellom with a hammer in his hand?*
A.    *No.*
Q.    Is there any reason why, sir, that you said in this statement when I – quote, when I turned around towards the hallway, I could see Terrance with hammer raised above his shoulder and I believed he was about to strike myself and TFO Quinn. Is there any reason why you made that statement, sir, on 4-29-2015?
A.    Yes, I do see it.
Q.    Okay. So which is it, sir, did he have a hammer or did he not have a hammer?
A.    Well, my statement said that he had a hammer, the one that wrote down or it was taken on the 29th.
Q.    But today as you sit here, you're under oath, sir, do you remember him having a hammer?
A.    That was without, like I say, recollection of this, like I say, so . . .
Q.    So your testimony today, sir, again you're under oath, Officer –
A.    Correct.
Q.    – Fitzgerald, do you remember Terrance Kellom having a hammer in his hand or not?
A.    Well, like I say, I couldn't recollect if he had a, a hammer in his hand.
Q.    I want to take you to Exhibit 7 of the Eaton deposition. And this is the title, Darrell Fitzgerald and Trevor Eaton's Responses to Plaintiff's First Set of Interrogatories and Request for the Production of Documents. *And in answer to question number 19 and 20, number 19 says, did you see the victim, Mr. Kellom, wielding a hammer at any time during the incident? It says that Defendant, Darrell Fitzgerald, did not personally observe plaintiff wielding a hammer from his vantage point, but was informed that it was the case following the incident.*

          So again this document, which was on January of 2018, about 10 months ago, *you said he didn't have a – you didn't see a hammer in his possession, in his hand – in , in holding a hammer; is that correct?*
A.    *Correct.*
Q.    *And you also – did you see the victim was found with a hammer immediately after he was shot? Your answer was, Darrell Fitzgerald did not personally observe plaintiff with a hammer from the vantage point, but was informed that was the case following the incident.*
       *Again so you did not see a hammer in his hand; is that correct, --*
A.    *Correct.*
Q.    – agent? I mean officer, I'm sorry.
       *Did you see Agent Quinn shoot – no. Did you see Agent Quinn's – any of*

> *Agent Quinn's shooting of Mr. Kellom?*
>
> A.      *No, I didn't.*
>
> Q.      Did you know whether there was any officers or agents around Mr. Kellom when the shooting took place?
>
> A.      Were there any other officers?
>
> Q.      Yes.
>
> A.      No.
>
> Q.      Do you know whether anyone was in the bathroom or on the stairs or anything of that nature?
>
> A.      That I don't know.
>
> Q.      *Did you see any hammer that evening at the house?*
>
> A.      *No.*

(Fitzgerald Dep. at 23-28) (emphasis added).

When examined by his own counsel, Defendant Fitzgerald testified that his memory of the events was a little hazy and that he would not have put anything in his report if it was not true or accurate. (Fitzgerald Dep. at 40-45).

### Evidence Regarding Where Terrance Lived On The Date Of Incident

Officer Brian Behrend's Report of Investigation states that the last address on Terrance Kellom's drivers license was an address on Terry Street in Detroit, Michigan. (ECF No. 77-5). It also states that the officers learned that Terrance Kellom's girlfriend lived on Princeton Street and that his father lived on Evergreen Street, both in Detroit. (*Id.*).

During his deposition, Kevin Kellom first appeared to concede that Terrance Kellom was living with him in his house on Evergreen Street on April 27, 2015, the date of the shooting:

> Q.      When did your son, Terrance, first arrive at your house at [XXXX] Evergreen?
>
>      MR. AYAD: Counsel, object as to foundation and form. What do you mean by arrive? Are you saying that date arrive on that date, that particular date on April 27th?
>
>      MR. HELMS: Yes.
>
>      MR. AYAD: Okay. Go ahead.
>
> THE WITNESS: What time was it? It would be like about between, probably between like five, I say like between three and maybe six a.m., something like

that, between those hours.

BY MR. HELMS:

Q.    Was he living with you at the time?

A.    Yes.

Q.,    So he was staying at that house on Evergreen?

A.    We had just moved there.

Q.    Just to clarify, when had you moved into the house?

A.    We moved into that house on that would be January of 2014 – September of 2014 so that would be January 15th of 2015, I'm sorry, 2015.

Q.    So did you son, Terrance, primarily live with you at that house between January of 2014 –

A.    2015.

Q.    Oh, 2015?

A.    Yeah.

Q.    – 2015 and April? Let me ask the question again. Did Terrance live with you between January 2015 and April of 2015?

A.    Yes, he did.

Q.    Do you know why he had been out?

A.    Why? He was with his girlfriend. They just out I guess with his girlfriend, out with his girlfriend.

Q.    Let me ask the full question before you answer. He had been out that night. He had been out the evening of April 26th?

A.    27th.

Q.    Let me ask the question. He had been out the evening of April 26th and returned the morning of April 27th because he had been out with his girlfriend?

A.    Yes. Yes.

Q.    How did you know he came in between three and six?

A.    Because I opened the door.

Q.    You were awake?

A.    No, I wasn't awoke, but he called me and told he was on his way home, him and his girlfriend, then I open the door. He always called me when he get to the door and I open the door.

(Kevin Kellom Dep. at 9-10). Later, during that same deposition, however, Kevin testified:

BY MR. AYAD:

Q.    I have a few questions. Mr. Kellom, remember the direct question by Mr. Helms asking you about whether your son Terrance lived with you in 2015?

A.    Uh-huh. Yes.

Q.    You remember that?

A.    Yes.

Q.    Now, was he living with you on April 27, 2015?

| A. | Okay. I say like this, his belongings and everything there, no. Only belongings there was me, Yvette, Teria, Anthony, but as far as his belongings there, no. Physically he hadn't really got his key and moved all his stuff there, he hadn't. |
|----|----|
| Q. | Is it your testimony he did not live there? |
| A. | He didn't live there, no. |
| Q. | Where did he live if he didn't live at your house? |
| A. | Um, I don't know. Probably with his girlfriend or his mother. |
| Q. | So when counsel showed you this document saying that, in the Complaint on Page of Exhibit 4 Paragraph 27, upon information and belief [XXXX] Evergreen was not Terrance Kellom's residence -- |
| A. | No. No. |

MR. HELMS: Objection, asked and answered.

BY MR. AYAD:

| Q. | When you answered the question as you did with Mr. Helms is that what you meant -- |
|----|----|

MR. HELMS: Objection, leading.

BY MR. AYAD:

| Q. | What did you mean by that when you told him that he lived there? |
|----|----|
| A. | Well, I thought by him being there with me means he lived there with me. |
| Q. | But he didn't physically live there with you? |
| A. | Not physically, no. |
| Q. | Do you know what his drivers license said? Did he have a drivers license, let me ask you? |
| A. | Did he have a drivers license? His I.D. read his mother's house. |
| Q. | Did you know if he got any mail to that address on April 27th, 2015? |
| A. | My house? |
| Q. | Yeah. |
| A. | No. |
| Q. | You said he had no clothing over there? |
| A. | No clothing was there, no. Only one that had clothing there was me, Teria, Yvette and Anthony. |

(*Id.* at 96-97).

Terrance Kellom's mother, Nelda Kellom, testified that Terrance Kellom lived with her

on the date of the shooting but that he sometimes stayed overnight at various places, including

his girlfriend's house, his dad's house, and his cousin's house:

| Q. | Do you know whether or not Terrance lived at that house on Evergreen before April 27th, 2015? |
|----|----|
| A. | You said before that? No. |

| Q. | At any point in time – so he never lived at that house, is that accurate? |
|---|---|
| A. | No. |
| Q. | Where was he living? |
| A. | With me. |
| Q. | He was with me, he was in and out. You know he would stay here. He would stay with his girlfriend. He would go spend the nights with his dad because he had called me a lot of times he had spent the night with his dad and he may be over his cousin's house. Majority of the time he would be on Englewood, that's majority of the time if he wasn't home. He would come home, shower, sleep, eat. |

(Nelda Kellom Dep. at 18-19).

## STANDARDS OF DECISION

Summary judgment is proper where the record shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A dispute is genuine only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party has done so, the non-moving party must point to evidence supporting its position that is "significantly probative." *Liberty Lobby*, 477 U.S. at 249. The mere existence of a "scintilla of evidence" in support of the plaintiff's position is insufficient to defeat a motion for summary judgment. *Id.*

Among other things, the individual Defendants in this action assert that they are entitled to qualified immunity with respect to the remaining claims against them.

"The doctrine of qualified immunity is an affirmative defense to *Bivens* and § 1983 claims." *Robertson v. Lucas*, 753 F.3d 606, 614-15 (6th Cir. 2014). Under the doctrine of qualified immunity, government officials performing discretionary functions generally are

shielded from liability from civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *Phillips v. Roane County*, 534 F.3d 531, 538 (6th Cir. 2008). Determining whether government officials are entitled to qualified immunity generally requires two inquiries: 1) whether, viewing the facts in the light most favorable to the plaintiff, the plaintiff has shown that a constitutional violation occurred; and 2) whether the right was clearly established at the time of the violation. *Id.*

There are three individual Defendants in this case (Eaton, Fitzgerald, and Quinn). "Each defendant's liability must be assessed individually based on his [or her] own actions." *Binay v. Bettendorf*, 601 F.3d 640, 650 (6th Cir. 2010).

Qualified immunity is an affirmative defense and, once raised, the plaintiff bears the burden of showing that the defendant is not entitled to qualified immunity. *Garretson v. City of Madison Heights*, 407 F.3d 789, 798 (6th Cir. 2005); *see also Barber v. Miller*, 809 F.3d 840, 844 (6th Cir. 2015) ("Once a defendant invokes qualified immunity, the plaintiff bears the burden of showing that (1) the defendant's acts violated a constitutional right and (2) the right at issue was clearly established at the time of the defendants's alleged misconduct."). If the plaintiff fails to carry this burden as to either element of the analysis, qualified immunity applies and the official is immune to the plaintiff's suit. *Cockrell v. Cincinnati*, 468 F. App'x 491, 494 (6th Cir. 2012).

## ANALYSIS

In the pending summary judgment motions, the remaining Defendants challenge each of the remaining claims against them.

22

# I. *Steagald* Claims Asserted By Kevin And Teria Kellom Against Defendants Eaton, Fitzgerald, And Quinn

Count VII of Plaintiffs' First Amended Complaint is titled, "*STEAGALD* VIOLATION (State supplemental claim)" and it asserts, in its entirety:

*As to Plaintiffs Kevin and Teria Kellom and as to all defendants*

90. Plaintiffs incorporate by reference their allegations contained in Paragraphs 1 through 89, above, as though fully set forth herein.

91. Upon information and belief, on the date of the incident, Terrance Kellom's official residence was not [XXXX] Evergreen, but elsewhere, where he lived with his girlfriend, Janay Williams, and their two minor children.

92. The house which Defendants unlawfully entered was the residence of Plaintiffs Kevin Kellom and Teria Kellom.

93. Plaintiffs Kevin Kellom and Teria Kellom had an expectation of privacy in their home under the Fourth Amendment (made applicable to State-actors by the Fourteenth Amendment) which was violated, unlawfully, by officers entering without a proper warrant and without consent in search of his son, Terrance.

94. Plaintiffs Kevin Kellom and Teria Kellom never consented to any Defendants entering and searching the house.

95. Defendant officers had only an arrest warrant for Terrance Kellom, as opposed to a search warrant and, therefore, violated Kevin Kellom's right to privacy by entering his home.  *Steagald v. United States*, 451 U.S. 204 (1981).

(First Am. Compl. at 20-21).  That count does not reference § 1983 or *Bivens*.  Although the First Amended Complaint indicates this is a "State supplemental claim," this count does not reference any state statutes or constitutional provisions.  Rather, it references *Steagald,* a United States Supreme Court case, and the Fourth and Fourteenth Amendments of the United States Constitution.

## A. To The Extent Count VII Purports To Assert A § 1983 Claim Against The Individual Defendants, That Count Is Dismissed.

Before analyzing the first ground for relief in the City of Detroit Defendants' motion, the

Court includes here some background information regarding § 1983 and *"Bivens* claims" (i.e., claims brought under *Bivens v. Six Unknown Named Agents*, 403 U.S. 388 (1971)).

Section 1983 of Title 42 of the United States Code provides for a civil cause of action for persons "who are deprived of any rights, privileges, or immunities secured by the Constitution or federal laws by those acting under color of *state law*." *Gillis v. Miller*, 845 F.3d 677, 693 (6th Cir. 2017) (emphasis added). "In *Bivens*, the Supreme Court held that individuals could 'recover money damages for any injuries [they have] suffered as a result of [a federal agent's] violation of the [Constitution]." *Baranski v. Fifteen Unknown Agents of Bureau of Alcohol, Tobacco and Firearms*, 452 F.3d 433, 438 (6th Cir. 2006). Thus, when *state* officers violate your federal constitutional rights you can sue them under § 1983, and when *federal* agents violate your federal constitutional rights you can sue them under *Bivens*. They are simply parallel claims that are differentiated based on whether the officer was a state or federal officer, and they are analyzed the same way:

> We review *Bivens* and § 1983 actions under the same legal principles, except for the requirement of federal action under *Bivens* and state action under § 1983. A plaintiff must prove two elements to prevail on either type of claim: (1) that he was deprived of a right secured by the Constitution or laws of the United States; and (2) that the deprivation was caused by a person acting under color of law.

*Webb v. United States*, 789 F.3d 647, 659 (6th Cir. 2015); *see also Robertson v. Lucas*, 753 F.3d at 613.

As their first ground for relief, the City of Detroit Defendants assert that Count VII "should be dismissed as the alleged constitutionally abhorrent conduct occurred at the hands of law enforcement officials acting under color of federal, rather than state law." (Defs.' Br. at 5).

To the extent that Count VII purports to assert a *Steagald* claim against Eaton or

Fitzgerald under § 1983, that claim must be dismissed because it is undisputed that at the time of the events in this case these officers were acting as federal, not state officers. Thus, a claim against them is not cognizable under § 1983. That also means that there could be no possible municipal liability, as to Chief Craig or the City of Detroit, stemming from this count.

Because these Defendants were acting as federal officers, this *Steagald* violation count is only cognizable against Eaton and Fitzgerald, by virtue of a *Bivens* (as opposed to § 1983) claim. Moreover, such a claim is only cognizable against them in their individual[3] capacity.

## B.    Qualified Immunity

The individual Defendants also assert that they are entitled to qualified immunity as to the *Steagald* claims in Count VII because, even construing the evidence in the light most favorable to Plaintiffs Kevin and Teria Kellom, they cannot establish that a constitutional violation occurred. More specifically, the individual officers assert that no constitutional violation occurred because: 1) Kevin Kellom gave consent for the officers to enter the house; 2) exigent circumstances permitted a warrantless entry into the house; and 3) the officers had a reasonable belief that Terrance Kellom lived at, and was present inside, the house at the time of entry. The Court will address each of these arguments.

### 1.    Consent To Enter The Home

Among other things, the individual officers assert that there was no constitutional violation because Kevin Kellom consented to the officers entering the house.

---

[3]That is because, as explained in this Court's prior Opinion and Order, the United States has not waived sovereign immunity as to alleged violations of the Constitution. (*See* ECF No. 52 at PageID.556-57).

For example, Defendant Quinn's motion asserts that Kevin Kellom consented to the officers' entry into the house, stating:

> First, the evidence demonstrates Kevin Kellom consented to officers entering his home. On the day of the shooting, April 27, 2015, Kevin told police officers in a recorded interview that he went down the stairs so "you know, I can let [the officers] in." (SOF, ¶ 15). He elaborated he "opened the door and I let them in. I ain't got nothing to hide from the police. I let them in." (*Id.*). At his deposition in September 2018, Kevin changed his story and said he did not give consent. (*Id.* at ¶ 80). However, his new version of the story is contradicted by every member of the DFAT team that came to his house. (*Id.* at ¶ 16). While the Court ordinarily accepts the facts alleged by the nonmovant as true, Kevin's self-serving claim that he did not consent is not entitled to such deference in light of his inconsistent statement made at the time of the shooting, and thus the Court should dismiss Count VII against Quinn. *See Bruederle*, 687 F.3d at 779) (quoting *Chappell*, 585 F.3d at 906) ("The court is not obliged to, and indeed should not, rely on the nonmovant's version of the facts where it is 'so utterly discredited by the record' as to be rendered a 'visible fiction.'").

(Quinn's Br. at 3).

As Plaintiffs' response brief notes, Quinn has selectively quoted portions of Kevin Kellom's statement, such that it does not show the full context of his testimony as to the entry by the officers. Notably, in his statement, Kevin Kellom stated that the officers who came to his door told him to "open the motherfucking door or I'm going to tear it down," and that after he asked if they had a search warrant, the officers directed him to "Open your door, sir" and he then opened the door.

Kevin Kellom's deposition testimony was consistent in that he testified he did not give consent for the officers to enter the house and that he asked if they had a search warrant. He testified that the officers never asked him for consent to enter and that he did not tell them they could enter the home. It is somewhat inconsistent in that, in his statement, Kevin Kellom said that he opened the door when directed to do so and in his deposition, three years later, he

testified that one of the officers "snatched" the door open.

Nevertheless, construing the evidence in the light most favorable to Plaintiffs, the Court concludes that a genuine issue of material fact exists as to whether Kevin Kellom consented to the officers entering his home.

### 2. Exigent Circumstances

The individual officers also assert that they are entitled to qualified immunity as to the *Steagald* claims because their entry was justified by exigent circumstances. For example, Defendant Quinn argues:

> Second, even if the Court finds there is a genuine dispute over whether consent was granted, exigent circumstances justified Quinn's entry. Exigent circumstances are measured by a "standard of objective reasonableness" and are typically present in three circumstances: "(1) when the officers were in hot pursuit of a fleeing suspect; (2) when the suspect represented an immediate threat to the arresting officers and public; [or] (3) when immediate police action was necessary to prevent the destruction of vital evidence or thwart the escape of known criminals." *Ewolski v. City of Brunswick*, 287 F.3d 492, 501 (6th Cir. 2002).
>
> On April 27, 2015, DFAT members were looking for fugitive Terrance Kellom to arrest him for armed robbery and a weapons violation. (SOF ¶¶ 6–7). They learned Terrance was likely staying in his father Kevin's house on Evergreen Road, and one DFAT member then observed Terrance walk into the house. (*Id.* at ¶¶ 10–11). Several DFAT officers approached the house and spoke to Kevin, and then they entered. (*Id.* at ¶ 12–14). Once they located Terrance on the second floor, they radioed for backup. (*Id.* at ¶¶ 17, 20); (*see also id.* at ¶¶ 18–23). Quinn entered the house only after the call for backup. (*Id.* at ¶ 21). Kevin himself corroborates that Quinn did not enter the house until after Terrance had been found, and after officers said Terrance was armed. (*Id.* at ¶¶ 82–84, 89). To summarize, Quinn only entered the house after officers found a dangerous fugitive in a house and requested assistance in arresting him.
>
> Thus, by all accounts, Quinn entered the house when exigent circumstances necessitated his entry, and, therefore, he did not violate Kevin or Teria's Fourth Amendment rights. *See Cook v. O'Neill*, 803 F.3d 296, 298–99 (7th Cir. 2015) (noting that exigent circumstances existed to enter an apartment where officers, having approached the apartment to question a witness, became aware that a violent, dangerous criminal was inside). *Cf. Spriggs v. Shanlian*, No. 12-14918, 2014 WL 1304910, at *9–10 (E.D. Mich. Mar. 11, 2014) (Edmunds, J.) (adopting magistrate's holding that even where one officer allegedly entered a

house in violation of the Fourth Amendment, the specific conduct of other
officers must be evaluated); *see also Dorsey v. Barber*, 517 F.3d 389, 399 n.4 (6th
Cir. 2008) ("Each defendant's liability must be assessed individually, based on
his or her own actions.") The Court should dismiss Count VII against Quinn.

(Quinn's Br. at 4-5).

"Federal courts have traditionally found exigent circumstances in the following three

instances: (1) when the officers were in hot pursuit of a fleeing suspect; (2) when the suspect

represented an immediate threat to the arresting officers and public; and (3) when immediate

police action was necessary to prevent the destruction of vital evidence or thwart the escape of

known criminals." *Hancock v. Dodson*, 958 F.2d 1367, 1375 (6th Cir. 1992).

Here, the officers were not in hot pursuit of a fleeing suspect and do not argue that their

entry was necessary to prevent the destruction of evidence. Rather, they appear to assert that

entry was necessary because Terrance Kellom "represented an immediate threat" to the officers

inside the house.

"In a civil action" such as this, the Sixth Circuit has explained that "the determination of

whether exigent circumstances exist is properly resolved by the jury." *Hancock*, 958 F.2d at

1375 (citations omitted); *see also Jones v. Lewis*, 874 F.2d 1125, 1130 (6th Cir. 1989) (The

determination of whether exigent circumstances existed is a question for the jury provided that,

given the evidence on the matter, "there is room for a difference of opinion.")

However, "in a case where the underlying facts are essentially undisputed, and where a

finder of fact could reach but one conclusion as to the existence of exigent circumstances, the

issue may be decided by the trial court as a matter of law." *Hancock,* 958 F.2d at 1375. That

was the situation in *Hancock*, where the undisputed evidence established that the officers

"received a call over the police radio that there existed a situation involving a suicidal and

possibly homicidal gunman.  The dispatch reported that shots had been fired.  At least one of the radio communications indicated that the subject had threatened to kill any police officer who arrived on the scene."  *Hancock*, 958 F.2d at 1375.  Given that undisputed evidence, the Sixth Circuit affirmed the trial court's grant of summary judgment because those facts established the situation as one representing an immediate threat to the arresting officers and public.  *Id*.  As such, the officers could enter the house without a warrant.

Here, in contrast, Quinn testified during his direct examination that, while he cannot remember exactly what was said over the radio, the call was just a request for another officer.

Defendant Eaton similarly argues that exigent circumstances allowed her to enter the house because she heard "calls for back-up" from fellow officers.  (Detroit Defs.' Br. at 25).

Construing the evidence in the light most favorable to Plaintiffs,  there is room for a difference of opinion on this issue.

### 3. Reasonable Belief That Terrance Kellom Lived At, And Was Present Inside, The House At The Time Of Entry.

Defendants note that "Count VIII of Plaintiffs' Complaint asserts a *Steagald* claim, alleging that without consent or exigent circumstances, the DFAT Officers entered their home with only an Arrest Warrant, rather than a Search Warrant."  (Detroit Defs.' Br. at 21).  They note that "[a]bsent consent or exigent circumstances, entry into a home to search or make an arrest is unreasonable under the Fourth Amendment unless done pursuant to a warrant.  *Payton v. New York*, 445 U.S. 573 (1980)."  (Defs.' Br. at 21).  "If, however, officials possess an arrest warrant, they may enter a house in which the suspect lives when there is also reason to believe the suspect is within.  *Id.* at 603. Officials may not, however, enter the residence of a third party in the belief that the fugitive they seek may be inside absent a valid search warrant.  *Steagald v.*

*United States*, 451 U.S. 204, 212 (1981)." (*Id.*).

The individual Defendants assert that, based on the information they learned during their investigation, the DFAT team members reasonably believed that Terrance Kellom was residing at his father's house on Evergreen on the date of the incident. (*See, e.g.*, Detroit Defs.' Br. at 22). They assert that, even if Terrance Kellom did not actually live at the Evergreen house, they are "entitled to qualified immunity, based upon a reasonable belief that Terrance had taken up residence in his father's home." (*Id.*). They assert that "[b]ecause the DFAT Officers reasonably believed that Terrance was a co-resident at the subject location, Plaintiff's Fourth Amendment rights were not violated even if Terrance did not live there." (*Id.* at 23).

This argument has merit. *See, eg.*, *Valdez v. McPheeters*, 172 F.3d 1220 (10th Cir. 1999); *El Bey v. Roop*, 530 F.3d 407, 416 (6th Cir. 2008).

*Valdez* involved the same type of situation that is presented here. In that case, the mother of a criminal suspect brought a civil action alleging that police officers and a federal agent violated her Fourth Amendment rights when they entered her residence based on an arrest warrant for her son. As is the case here, the mother claimed that she told the officers that they could not search for her son without a search warrant. The mother brought suit after the officers entered the house, claiming a *Steagald* violation. The district court granted summary judgment in favor of the officers and the mother appealed. The Tenth Circuit affirmed. In doing so, it noted:

> One of the circumstances which may permit an entry into a residence without a search warrant is the existence of a valid arrest warrant for a suspect who is believed to live in the residence. This is because "an arrest warrant founded on probable cause implicitly carries with it the limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within." *Payton*, 445 U.S. at 603, 100 S.Ct. at 1388. "Because an arrest warrant authorizes

the police to deprive a person of his liberty, it necessarily also authorizes a limited invasion of that person's privacy interest when it is necessary to arrest him in his home." *Steagald*, 451 U.S. at 214 n.7, 101 S.Ct. at 1649 n.7. Absent exigent circumstances, however, an arrest warrant by itself does not authorize entry into the home of a third party. *Id.*, at 215, 101 S.Ct. 1642.

*Valdez*, 172 F.3d at 1224. The Tenth Circuit then explained that "[t]he majority of circuits which have addressed the issue have agreed that, under *Payton*, police officers entering a residence pursuant to an arrest warrant must demonstrate a reasonable belief that the arrestee lived in the residence, and a reasonable belief that the arrestee could be found within the residence at the time of the entry." *Id.* (collecting cases). The Tenth Circuit agreed with those authorities, holding that the defendant officers "were entitled to enter the [plaintiff's] residence if there was a reasonable basis for believing that [the plaintiff's son] both (1) lived in the residence and (2) could be found within at the time of entry." *Id.*

In so holding, the Tenth Circuit explained that "requiring actual knowledge of the suspects true residence would effectively make *Payton* a dead letter. In the real world, people do not live in individual, separate, hermetically-sealed residences. They live with other people, they move from one residence to another. Requiring that the suspect actually reside at the residence entered would mean that officers could never rely on *Payton*, since they could never be certain that the suspect had not moved out the previous day and that a *Bivens* or a 42 USC § 1983 claim would then be made against them by another resident." *Id.* at 1225. "Thus, entry into a residence pursuant to an arrest warrant is permitted when 'the facts and circumstances within the knowledge of the law enforcement agents, when viewed in the totality, must warrant a reasonable belief that the location to be searched is the suspect's dwelling, and that the suspect is within the residence at the time of entry.'" *Id.*

*El Bey* appears to indicate that the Sixth Circuit takes the same view. In that case, the officers claimed "that they believed that they were actually entering the residence of Ray, the subject of the arrest warrant." *El Bey*, 530 F.3d at 415 ((citing *United States v. Bervaldi*, 226 F.3d 1256, 1267 n.11 (11th Cir. 2000) and "noting that the officers had a reasonable belief that the residence searched was the residence of the subject of the arrest warrant, 'not some third party's residence as in *Steagald'* and explaining that *Steagald* was therefore inapplicable."). The Sixth Circuit further stated that "the two components to the reasonable-belief standard can be stated as follows: the officers must have had a reasonable belief both (1) that Ray lived at the 1580 Greenlake Drive residence, and (2) that Ray was inside the residence at the time that they entered." *Id*. at 416.

This Court concludes that, under this line of authority, the three individual Defendants are entitled to qualified immunity as to the *Steagald* claims asserted by Kevin and Teria Kellom.

The first step in the qualified immunity analysis is to consider whether, viewing the facts in the light most favorable to Plaintiffs, could they establish a Constitutional violation with respect to any of the three officers (Eaton, Fitzgerald, and Quinn).

Based on the above authorities, the defendant officers were entitled to enter the house on Evergreen if there was a reasonable basis for believing that: 1) Terrance Kellom lived there; and 2) Terrance Kellom could be found inside the house at the time of entry. *Valdez, supra; El Bey, supra.*

On April 27, 2015, the DFAT conducted an investigation to determine where Terrance Kellom was living and the team members were in communication with each other throughout that investigation. They eliminated the address that was listed on his driver's license and then,

based on records from a corrections facility, went to the address where they believed Terrance's girlfriend lived. Terrance's girlfriend, and her mother, told the officers Terrance was staying at his father's house on Evergreen. Terrance's girlfriend gave the officers a detailed description of Terrance's car (ie., a silver, four-door Taurus with a green sticker in the back window). Eaton then surveilled the house on Evergreen, where she saw Terrance's car parked in the driveway. Eaton also saw Terrance exit and re-enter the house. After Eaton observed Terrance enter and remain inside the house, she so advised the team. Based on this evidence, the officers had a reasonable basis for believing that Terrance Kellom lived at the house on Evergreen with his father. *See, e.g., Harris v. Smith*, 390 F. App'x 577, 579 (6th Cir. 2010) (officers had reason to believe that suspect lived at the home, where an employee of a state agency told officers, in connection with their investigation, that the suspect and his girlfriend were living at the house and the officers then surveilled the house and saw the suspect's girlfriend drive up and go inside.).

The second inquiry is also satisfied – as Plaintiffs' Counsel acknowledged at the May 2, 2019 hearing. It is undisputed that Officer Eaton conducted surveillance at the Evergreen House prior to the search on April 27, 2015 and personally observed Terrance Kellom enter the house and remain inside. Thus, all of the officers on the DFAT had a reasonable basis for believing that Terrance Kellom could be found inside the house at the time of entry on April 27, 2015.

Accordingly, the Court agrees with Defendants that Kevin and Teria Kellom cannot establish that a constitutional violation occurred. Thus, the three officers are entitled to qualified immunity as to the *Steagald* claims asserted in Count VII.

## II. The Estate's *Bivens* Excessive Force Claims Against Defendants Eaton, Fitzgerald And Quinn

The Estate's excessive force claims, brought as *Bivens* claims in Count I, are asserted against three individual Defendants: 1) Eaton; 2) Fitzgerald; and 3) Quinn. All three officers contend that they are entitled to summary judgment in their favor as to the excessive force claims against them.

### A.      Defendants Eaton And Fitzgerald

In addition to Defendant Quinn, the sole officer who is alleged to have shot Terrance Kellom, the Estate also asserts its excessive force claims against Defendants Eaton and Fitzgerald. Eaton and Fitzgerald assert that, regardless of the outcome of the excessive force claim against Quinn, they are entitled to qualified immunity because they are only liable for their own conduct and the undisputed evidence reflects that they had no opportunity to intervene to prevent the shooting. As such, they assert they committed no constitutional violation and are therefore entitled to qualified immunity as to Count I.

The Court agrees that Eaton and Fitzgerald are entitled to qualified immunity as to the excessive force claims asserted against them.

"Liability for excessive force requires a showing that the defendant either (1) actively participated in the use of excessive force, (2) supervised the officer who used excessive force, or (3) owed the victim a duty of protection against the use of excessive force." *Pennington*, 644 F. App'x at 547; *see also Turner v. Scott*, 119 F.3d 425, 429 (6th Cir. 1997); *Ontha v. Rutherford Cty., Tennessee*, 222 F. App'x 498, 505 (6th Cir. 2007).

Here, the Estate does not allege that either Defendant Eaton or Fitzgerald used any excessive force themselves or that they supervised Defendant Quinn. Rather, the Estate alleges that "Defendants Eaton and Fitzgerald had the duty and opportunity to intervene" to protect

34

Terrance Kellom and "prevent the shooting" by Defendant Quinn. (First Am. Compl. at 10).

"An officer may be liable for failing to prevent an act of excessive force if he or she: (1) observed or had reason to know that excessive force would be or was being used, and (2) had both the opportunity and means to prevent the harm from occurring." *Pennington,* 644 F. App'x at 547-48; *Turner*, 119 F.3d at 429.

"Where an act of excessive force unfolds in a matter of seconds, the second requirement is generally not satisfied.*" Pennington,* 644 F. App'x at 548. That is because the Sixth Circuit "has reasoned that it demands too much of officers to require that they intervene within a sudden and quickly-expired moment of opportunity." *Id.*

Defendants Eaton and Fitzgerald assert that they are entitled to qualified immunity because the Estate cannot present evidence to establish that either of them had reason to know that Defendant Quinn was going to shoot or that either officer had the opportunity and means to prevent Agent Quinn from shooting Terrance Kellom.

*Notably, Plaintiffs' response brief does not respond to this argument*. Thus, the Estate's response brief does not direct the Court to any evidence that could establish a constitutional violation by Eaton or Fitzgerald for having failed to prevent any excessive force used by Quinn.

At the hearing, the Estate's Counsel failed to direct the Court to evidence that could establish that either Eaton or Fitzgerald had reason to know that Defendant Quinn was going to shoot or that either officer had the opportunity or means to prevent the shooting. Rather, counsel suggested that Eaton and Fitzgerald could have waited for a search warrant before entering the house. Plaintiffs have failed to meet their burden of establishing that Defendants Eaton and Fitzgerald are not entitled to qualified immunity.

Moreover, Defendants, have directed the Court to evidence that supports their position on this issue. Kevin Kellom testified that the events "happened so quick," and unfolded in a matter of seconds. (Kevin Kellom Dep. at 57; Kevin Kellom Interview at 54-55). Kevin Kellom also testified that the officer who shot his son did so without any kind of warning that he was about to do so:

> Q.  Before the officer shot did he say anything or give any warning?
> A.  No.
> Q.  As far as you can tell he just walked into the house and shot?
> A.  Yes.

(Kevin Kellom Dep. at 45).

Kevin Kellom also testified that Quinn shot his son while Terrance Kellom was in the downstairs hallway. It is undisputed that "[a]t all times during the DFAT presence inside the home, Officer Fitzgerald remained in the living room, monitoring Teria and Kevin Kellom. (ECF No. 104 at PageID.2626; ECF No. 107 at PageID2747).

Eaton testified that she was on the front porch when she heard the shots and then saw Terrance Kellom in the downstairs hallway as he was shot and fell to his knees. (Eaton Dep. at 50-52). She testified that there was just a slight pause between the initial shot and the remaining shots. (*Id*. at 55). Eaton did not come back in the house until after the shots had ended. (*Id*.)

Thus, neither Fitzgerald nor Eaton were even in the same room as Quinn and Terrance Kellom just before or at the time of the shooting. Thus, the Court shall grant summary judgment in favor of Eaton and Fitzgerald as to the Estate's excessive force claims against them because they are entitled to qualified immunity as to those claims.

### B.      Defendant Quinn

As to the excessive force claim asserted against him, Quinn's motion asks the Court to

grant summary judgment in his favor because he did not use excessive force when he defended himself from the attack of a dangerous fugitive. In making this argument, Quinn asserts that: 1) the evidence establishes that he reasonably acted in self defense; 2) the case law supports granting summary judgment as to Quinn; 3) the deposition testimony of Kevin Kellom and Teria Kellom should be discredited because of their inconsistencies, implausability, and lack of corroborating evidence; and 4) courts have granted summary judgment to *Bivens* and § 1983 defendants in similar scenarios where the plaintiff's testimony was discredited.

The only way this Court could grant summary judgment in favor of Defendant Quinn on this claim is if this Court discredits the testimony of Kevin Kellom.

Again, the parties have divergent versions of the facts. The officers have testified that Terrance was located hiding in the second floor attic crawl space and refused to come out peacefully, shouting things like "shoot me, bitch," "I have a gun," and "You're gonna have to kill me." Defendant Quinn contends that Terrance had a hammer and was tearing a hole through the attic floor, so that he could escape from the attic crawl space by going through that hole and dropping down onto the main floor. Quinn's motion asserts that Quinn descended the stairs, hoping to catch Terrance where he would land on the first floor. (Defs.' Br. at 9). Quinn testified that Terrance came out of the back, left bedroom, that had a blanket draped where a door would normally be, holding a hammer and approaching him aggressively. Quinn ordered Terrance to drop the hammer but he did not comply. Quinn testified he shot Terrance once or twice, to protect himself and fellow officers, hoping that Terrance would stop coming towards him. Quinn testified that Terrance kept advancing towards him, making him question whether he was hitting him with his shots because he did not stop. (Quinn Dep. at 111-16).

Quinn's motion contends that "[a]ll of the physical evidence in this case corroborates the account of Quinn and his fellow DFAT officers.  For example, the pictures show (1) the damage to the attic ductwork, attic floor, and closet ceiling; (2) the blanket on the floor near the back left bedroom; and (3) the hammer near where Terrance fell to the floor – all of which bolster Quinn's version of the events."  (Defs.' Br. at 10-11).  The motion further states that: 1) there is a video, during an interview with Kevin Kellom, that shows a hole in the floor large enough for a man to go through (ie., the "Charlie LeDuff Video"); 2) that forensic testing show fibers on Terrance's clothes matched fibers from the drywall and insulation at the house; and 3) the autopsy noted Terrance had abrasions on his body that would be consistent with him dropping down through the ceiling.

Quinn's motion contends that the deposition testimony of Kevin Kellom (and Teria Kellom) should be entirely discredited because of their inconsistencies, implausability, and lack of corroborating evidence.  (Defs.' Br. at 14).  He asserts that the "Court should not rely on Kevin and Teria Kellom's version of the shooting because they have no evidence other than their testimony, and that testimony is implausible on its face and is utterly discredited by the record, including by their own previous statements."  (*Id*.).

In so asserting, Defendants direct the Court to *Bruederle v. Louisville Metro Gov't*, 687 F.3d 771, 779 (6th Cir. 2012) and *Chappell v. City of Cleveland*, 585 F.3d 901, 906 (6th Cir. 2009).  In those cases, the Sixth Circuit recognized that a district court "is not obliged to, and indeed should not, rely on the nonmovant's version [of the events] where it is 'so utterly discredited by the record' as to be rendered a 'visible fiction.'"  *Chappell,* 585 F.3d at 906 (quoting *Scott v. Harris*, 550 U.S. 372, 378-80 (2007))*; see also Pennington v. Terry*, 644 F.

App'x 533, 538 (6th Cir. 2016) (explaining that while the court is generally required to adopt the plaintiff's version of the facts, that is not so when the plaintiff's version is "blatantly contradicted by the record," and noting that "exception most commonly applies where the record contains a videotape depicting the disputed facts and contradicting one party's version of events.").

This Court does not believe this is one of those rare cases where the testimony of the plaintiff is so utterly contradictory, or so discredited by the record evidence, that the Court can simply discredit it for purposes of summary judgment. This is not a case where there is video evidence of the events, that expressly discredits the plaintiff's version of events. There is no video evidence of the shooting, or of any events that occurred inside the house.

While there are some inconsistencies and differences between Kevin Kellom's statement given on the day of the event, and his deposition taken three years later, that is not that unusual, especially given the time gap. Moreover, his basic version of the key facts remains fairly consistent: once the officers and Terrance were downstairs in the hallway, Terrance was cussing at the officers but was not resisting. At the time he was shot by Quinn, Terrance had his hands upwards and open and he was not holding anything, including a hammer.

In addition, the versions of events are not so contradictory as to be totally discredited by the physical evidence. It appears that one of two things happened on the day of the shooting: 1) Terrance broke a hole in the attic crawl space and came through the floor to the downstairs bedroom, and then entered the hallway; or 2) Terrance came down the stairs with officers, and then entered the hallway. (*See* Diagram of House, Defs.' Ex. 10). Regardless of how Terrance got downstairs, the key facts are what occurred while Terrance was in the hallway on the main

floor, right before he was shot.  If Terrance was not resisting, and had his hands up and open, and had no weapon, then a reasonable jury could find that Quinn used excessive force.  Terrance could have come through the floor, leaving fibers on his clothes and abrasions on his body, and yet entered the hallway without a hammer, and had his hands upwards and open at the time he was shot.

For this Court to simply discredit all of Kevin Kellom's testimony would be for the Court to improperly make a credibility determination at the summary judgment stage.  This is especially so in light of other evidence, such as Fitzgerald's deposition testimony, that when construed in the light most favorable to Plaintiffs, could support Kevin Kellom's testimony that Terrance was not wielding a hammer at the time he was shot.  Defendant Quinn is not entitled to qualified immunity as to the Estate's excessive force claim against him.  That claim shall proceed to a jury trial.

### III.  The *Monell* Liability Count Against The City And Chief Craig

The City of Detroit Defendants also ask the Court to dismiss Count VIII because there can be no basis for municipal liability in this action because there are no remaining § 1983 claims in this case:

> [B]efore a *Monell* claim may be made, Plaintiffs must establish that § 1983 has been implicated; and a § 1983 claim cannot be made without showing that an officer deprived a person of a Constitutional right, while acting under color of State law. Hence, because the alleged conduct occurred at the hands of officers acting under color of Federal law, § 1983 is not implicated and Summary Judgment for City of Detroit and Chief Craig is appropriate.

(Defs.' Br. at 8-9).

The Court agrees that the *Monell* liability count must be dismissed because there can be

no basis for municipal liability in this case, given the claims that remain.[4]

## IV. The Estate's FTCA Claims Against The United States

There are two separate tort claims pending against the United States: 1) a claim under Michigan's wrongful death statute (Count V); and 2) a claim for intentional infliction of emotional distress under Michigan law (Count VI). In the summary judgment motion filed by the United States, it challenges both of those claims.

### A. Subject Matter Jurisdiction Challenge To The Estate's FTCA Claim

The Government asserts that the Estate's FTCA claims must be dismissed because the Estate did not exhaust its administrative remedies and this Court therefore lacks subject matter jurisdiction. The Government notes that the way the issue was briefed by the parties, at the motion-to-dismiss phase, the issue presented was whether the Estate's original complaint asserted FTCA claims against the United States. (Def.'s Br. at 2). The Government's motion asserts that "by framing the issue in this manner, defendant United States inadvertently mischaracterized the jurisdictional issue" and, in this motion, seeks to clarify and re-assert its jurisdictional argument. (*Id.*).

In response, Plaintiffs' brief complains that the Government is raising an issue that the Court has already considered. Plaintiffs assert that it is improper for the Government to raise this argument.

As the Government's reply brief notes, however, this is a challenge to the Court's *subject matter jurisdiction*. A challenge to subject matter jurisdiction can be raised at any time and can

---

[4]Following the Court's ruling on the motions to dismiss, the City of Detroit Defendants filed a motion seeking reconsideration, asking the Court to rule that there can be no municipal liability as to the City. In light of this ruling, that motion is moot.

never be waived.  *See, e.g., Herr v. U.S. Forest Serv*., 803 F.3d 809, 813-14 (6th Cir. 2015) ("In

the absence of subject-matter jurisdiction, a federal court must dismiss the lawsuit – no matter

how far along the litigation has progressed (including to the last-available appeal), no matter

whether the parties forfeited the issue, no matter indeed whether the parties have waived it.").

As such, the Court will consider this challenge to this Court's subject-matter jurisdiction over the

FTCA claims in this case.

The way this issue unfolded at the motion-to-dismiss phase, the Court considered

whether the Estate's original complaint asserted FTCA claim or named the United States as a

Defendant:

> This Court agrees that if the original complaint filed by the Estate asserted
> a FTCA claim against the United States, then it would have been premature
> because it was filed on April 6, 2017, before the Estate had even filed its
> administrative claim.  If such a premature complaint had been filed by the Estate,
> then the Estate would have to file a new lawsuit after the denial of its
> administrative complaint, not an amended complaint in this action.  In addition, if
> that were the case, because the Estate's administrative denial occurred on
> February 1, 2018, a new lawsuit would have had to have been filed by the Estate
> by August 1, 2018.  Accordingly, if the Estate's original complaint asserted a
> FTCA claim against the United States, the Court would have to dismiss this
> action for lack of subject matter jurisdiction and, because August 1, 2018 has now
> passed, the Estate's wrongful death claim would be time-barred.
> That brings us what appears to be the real issue – whether the Estate's
> original complaint asserted FTCA claims against the United States.

(ECF No. 52 at PageID.560).  This Court then stated that while it was not aware of any Sixth

Circuit cases directly on point as to this issue, a published Ninth Circuit case, *Valadez-Lopez v.*

*Chertoff,* 656 F.3d 851 (9th Cir. 2011), appeared to support the Estate's position that the original

complaint did not assert FTCA claims because it did not name the United States as a Defendant

or reference the Federal Tort Claims Act.  As such, this Court declined to dismiss the Estate's

FTCA claims at the motion-to-dismiss phase.

The Government's current motion contends the inquiry before the Court is "whether the Estate had exhausted its administrative remedies before the Attorney General first certified under the Westfall Act that the employee was acting within the scope of his employment at the time of the alleged negligence." (Govt.'s Br. at 2). As explained below, the Government has now set forth a cogent argument, supported by on-point references to Sixth Circuit and Supreme Court authority, that the Estate failed to exhaust administrative remedies and, therefore, this Court lacks subject matter jurisdiction over the FTCA claims asserted against the United States. The Government's current motion makes two critical points that change the outcome here.

Before getting to those two critical points, an overview of the relevant concepts is provided here.

Under the FTCA, lawsuits against governmental employees acting in their official capacities are treated as suits against the United States. *Kentucky v. Graham*, 473 U.S. 159, 166 (1985). The FTCA, however, requires a plaintiff to exhaust administrative remedies prior to instituting such a lawsuit. 28 U.S.C. § 2675; *McNeil v. United States*, 508 U.S. 106, 113 (1993).

An administrative claim is deemed denied if six months pass without a decision. *Id.* Once there has been a denial of claim, the claimant must file suit in federal court within six months. 28 U.S.C. § 2401.

When a claimant "prematurely" files a FTCA lawsuit (ie., when the claimant files it before the denial of an administrative claim), then the federal court lacks subject matter jurisdiction over the action and it must be dismissed. *McNeil, supra.* Following *McNeil*, several courts have ruled that premature FTCA suits cannot be cured by virtue of filing an amended complaint in the same action, after the administrative claim is denied. Rather, in such situations,

a new lawsuit must be initiated within the applicable six-month time period for filing suit after the denial. *See, e.g., Duplan v. Harper*, 188 F.3d 1195, 1199 (10th Cir. 1999); *Sherman v. United States*, 48 F.Supp.3d 1019, 1024 (E.D. Mich. 2014); *VanHorn v. Walton*, 2013 WL 119252 at *2 (E.D. Mich. 2013); *Brown v. United States*, 2010 WL 11610545 at * 2 (N.D. Ohio 2010).

"The Federal Employees Liability Reform and Tort Compensation Act of 1988, commonly known as the Westfall Act, accords federal employees absolute immunity from common-law tort claims arising out of acts they undertake in the course of their official duties." *Osborn v. Haley*, 549 U.S. 225, 229 (2007) (citing 28 U.S.C. § 2679(b)(1)). When a federal employee such as Quinn is sued for wrongful or negligent conduct, the Westfall Act "empowers the Attorney General to certify" that he "'was acting within the scope of his office or employment at the time of the incident out of which the claim arose.'" *Id.*

> 1. **The Estate's Original Complaint Is Deemed To Have Asserted A FTCA Under Sixth Circuit Authority, And It Was Prematurely Filed Before The Estate Filed An Administrative Claim.**

In its motion, the United States directs the Court to a Sixth Circuit case that reflects that when a plaintiff asserts any tort claim against a federal employee alleged to have occurred while the employee was acting in his official capacity – which is the situation here as to Quinn – that is considered a FTCA claim for purposes of administrative exhaustion regardless of whether it was labeled as such in the complaint. In *Harris*, the Sixth Circuit stated:

> [Plaintiff's] second amended complaint *included allegations of torts committed by governmental employees acting in their official capacities. [Plaintiff's] claims are cognizable, if at all, under the FTCA.* Accordingly, the district court properly applied FTCA law to its decisions regarding those claims. In particular, the district court found [Plaintiff] had not conformed to the administrative exhaustion requirement of the FTCA, under which he should have filed a claim with the

44

appropriate federal agency and waited for the claim to be denied before filing suit.

*Harris v. City of Cleveland*, 7 F. App'x 452, 458 (6th Cir. 2001) (emphasis added).  The United States asserts that "[a]s a result, the holding in *Harris* indicates that the Sixth Circuit considers any tort claim against a federal employee alleged to have occurred while the employee was on duty and performing his or her job duties to be an FTCA claim for purposes of administrative exhaustion, whether or not the plaintiff labeled it as such.  Because this precedent conflicts with the Ninth Circuit's assumptions in *Valdez-Lopez*, this Court should follow *Harris* and not *Valdez-Lopez*."  (Def.'s. Br. at 13).

The Estate's original complaint was filed on April 6, 2017.  That complaint did not name the United States as a Defendant and did not reference the Federal Tort Claims Act.  But it identified Defendant Quinn as a "federal law enforcement agent employed by Immigration and Customs Enforcement, a federal agency organized and existing under the laws of the United States" and expressly alleged that Quinn acted "within the course and scope of his employment, and under color of federal law."  (ECF No. 1 at PageID.4).  The original complaint included a wrongful death claim against Quinn under Michigan law.

As such, the Estate's claim against Quinn in the original complaint was one under the FTCA, even though Plaintiffs' Counsel did not label it as such.  It is undisputed that the Estate did not file an administrative claim prior to filing this action.  Accordingly, the Estate's counsel filed this FTCA action prematurely.

> **2.** **In Addition, Even If The Original Complaint Were Not Deemed To Have Asserted A FTCA Claim At The Time Of Filing, As Of October 16, 2017, The United States Was Deemed Substituted For Quinn In This Action By Virtue Of The Certification, Which Would Also Make This Action Prematurely Filed.**

The second critical point that the Government's motion makes is that upon the Attorney General's certification under the Westfall Act, this action is automatically deemed to be brought against the United States (not the named employee) and the litigation is thereafter governed by the FTCA. *Osborn*, 549 U.S. at 228 & 230; 28 U.S.C. § 2679*; see also Harbury v. Hayden,* 522 F.3d 413, 416 (D.C. Cir. 2008) ("Upon the Attorney General's certification, the tort suit automatically converts to an FTCA" action against the United States and the FTCA's requirements apply to the case.); *Zolman v. United States*, 170 F.Supp.2d 746, 748 (W.D. Mich. 2001) (Upon certification, "the United States was automatically substituted as the party defendant.").

Here, on October 16, 2017, Defendant Quinn filed a Motion for Partial Dismissal and attached a Certificate of Scope of Employment as to Quinn as Exhibit 2 to the motion (ECF No. 12-3) and the motion stated that the United States should be substituted for Quinn as to the wrongful death claim.

Accordingly, even if the original complaint were not deemed to have been brought under the FTCA by virtue of *Harris*, then "by automatic action of the Westfall Act and the Attorney General's certification, the Estate asserted an FTCA claim against the United States" as of October 16, 2017.  (Defs.' Br. at 5).

The Estate did not file an administrative complaint until April 25, 2017 – after it filed this case.  That claim was deemed administratively denied six months later, on October 25, 2017. Thus, that would be the earliest date which the Estate could have filed this action.  As such, even if this case were not deemed to be a FTCA action until October 16, 2017, it still would have been prematurely filed.

**3.** **Because The Estate Prematurely Filed This Action, Before The Actual Or Constructive Denial Of Its Administrative Claim, This Court Must Dismiss The FTCA Claims In This Action For Lack Of Subject Matter Jurisdiction.**

As noted above, and as explained in this Court prior Opinion & Order, when a premature FTCA case is filed, it cannot be cured by virtue of filing an amended complaint in the same action, after the administrative claim is denied. Rather, in such situations, the case must be dismissed for lack of subject matter jurisdiction. The Court concludes that it lacks subject matter jurisdiction over the Estate's FTCA claims in this action and shall dismiss them.

### CONCLUSION & ORDER

For the reasons set forth above, **IT IS ORDERED** that the City of Detroit Defendants' summary judgment motion is **GRANTED** to the extent the Court **RULES** that: 1) Defendants Eaton and Fitzgerald are entitled to qualified immunity as to the *Bivens* excessive force claims asserted against them in Count I; 2) the *Steagald* claims in Count VII, are only cognizable as *Bivens* claims, not § 1983 claims, because the officers were acting under federal and not state law, and they only remain as to the Agents/Officers in their individual capacities; 3) Defendants Eaton and Fitzgerald (and Quinn) are entitled to qualified immunity as to the *Steagald* claims asserted in Count VII; and 4) the *Monell* liability count, Count VIII, fails as a matter of law because there is no basis for imposing municipal liability in this action that has no viable § 1983 claims.

**IT IS FURTHER ORDERED** that the court **GRANTS** the summary judgment motion filed by the United States because the Court concludes that it lacks subject matter jurisdiction over the Estate's Federal Tort Claims Act claims in this action.

**IT IS FURTHER ORDERED** that the summary judgment motion filed by Defendant

47

Quinn is **GRANTED IN PART AND DENIED IN PART.**  The motion is **GRANTED** to the extent that the Court **RULES** that Defendant Quinn is entitled to qualified immunity as to the *Steagald* claims asserted by Kevin and Teria Kellom in Count VII.  The motion is **DENIED** in all other respects.

Accordingly, the Estate's excessive force claim asserted against Defendant Quinn is the sole remaining claim in this action.  That claim shall proceed to a jury trial.

**IT IS SO ORDERED.**

s/Sean F. Cox
Sean F. Cox
United States District Judge

Dated:  May 21, 2019