UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

Nelda Kellom, as personal representative
of the estate of Terrance Kellom, deceased,

      Plaintiff,

v.                                    Case No. 17-11084

Mitchell Quinn,                   Sean F. Cox
                                   United States District Court Judge

      Defendant.

_____/

## OPINION & ORDER
## ON MOTIONS IN LIMINE

Terrance Kellom was shot and killed when a United States Marshal Detroit Fugitive

Apprehension Team was attempting to arrest him at a house in Detroit, Michigan on April 27,

2015. Thereafter, his Estate and his relatives filed this action, asserting multiple claims against

several Defendants. There is only one remaining claim in this action – the Estate's excessive

force claim against Defendant Mitchell Quinn. That sole claim is scheduled to proceed to a jury

trial on October 15, 2019. The parties have filed multiple pretrial motions in limine.

The adequacy of the state and federal criminal investigations that occurred after the

shooting is not at issue. Rather, as this Court reminded counsel at the August 19, 2019 hearing

on these motions, the excessive force claim that remains in this action is governed by *Graham v.

Connor*, 490 U.S. 386, 394-95 (1989). That is, the reasonableness of a particular use of force

must be judged from the perspective of a reasonable officer on the scene. *Id*. at 394-54. The

force used must be objectively reasonable in light of the particular facts and circumstances that

confronted the officers. *Id*. Important considerations include the severity of the crime, whether

the suspect poses an immediate danger to the officers or others, and whether the suspect is actively resisting arrest or attempting to flee. *Id*.

Accordingly, as explained below, the Court shall deny the Estate's motions in limine that ask the Court to preclude evidence of relevant facts and circumstances that confronted Agent Quinn on the day of the shooting. The Court shall grant Quinn's motion to preclude reference to dismissed claims and counsel for the Estate may not present evidence, or make assertions, regarding the adequacy of the criminal investigations. In addition, the Court shall grant Quinn's "Motion Regarding Previous Assertion Of Fifth Amendment Rights" and Plaintiffs' Counsel is precluded from arguing or implying at trial that Quinn should have been interviewed during the criminal investigations. The Estate's expert shall be precluded from offering any opinions as to the adequacy of the criminal investigations. Quinn's motion seeking a "ruling that law enforcement reports and conclusions are not inadmissible hearsay" under Fed. R. Evid. 803 shall be denied as to his challenged exhibits.

This Opinion & Order also sets forth this Court's rulings on the parties' additional motions in limine, that address a variety of other issues.

## BACKGROUND

Terrance Kellom was shot and killed when a United States Marshal Detroit Fugitive Apprehension Team was attempting to arrest him on an outstanding arrest warrant for armed robbery. Thereafter, his Estate and his relatives filed this action, asserting multiple claims against several Defendants. A number of claims were dismissed in connection with motions to dismiss. Then, following the close of discovery, Defendants filed summary judgment motions as to the remaining claims.

In an Opinion and Order issued on May 21, 2019, this Court denied Quinn's request for summary judgment as to the Estate's excessive force claim, asserted in Count I, as a *Bivens* claim. As to that claim, this Court concluded that, construing the evidence in the light most favorable to the Estate, there is a genuine issue of material fact as to whether Defendant Quinn committed a constitutional violation by virtue of having used excessive force. That sole claim is proceeding to a jury trial. As to all remaining claims, this Court granted summary judgment in favor of Defendants.

Those dismissed claims, asserted by the Estate and the Decedent's relatives, included: 1) excessive force claims against Eaton and Fitzgerald under *Bivens* and § 1983; 2) conspiracy claims under § 1985 and *Bivens*; 3) a wrongful death claim under Michigan law; 4) a claim for intentional infliction of emotional distress under Michigan law; 5) a *Steagald claim*, asserting that the officers' entry into the home was unlawful; and 6) a *Monell* municipal liability claim.

The Estate's excessive force claim against Defendant Quinn is set to proceed to a jury trial on October 15, 2019. The parties have filed numerous motions in limine.

In addition, on August 15, 2019, the parties filed trial briefs, which contain each party's theory of the case. (ECF Nos. 178 & 180). As the Court explained at the Joint Final Pretrial Conference, this Court typically uses those case theories during the jury selection process, to give potential jurors an overview of the case.

Plaintiff's trial brief contains the following as the Estate's theory of its excessive force claim in this case:

Defendant and several other law enforcement [sic] entered [Terrance Kellom's][1] father's home to arrest [him] on a warrant for a charge that [Terrance had] never been convicted of. There, Defendant approached [Terrance] with reckless disregard for his constitutional rights and his life. Defendant shot [Terrance] four times unjustly and without basis, killing him. Defendant's shooting was excessive force as [Terrance] had no weapon or item that could be used as a weapon, was surrounded by armed law enforcement, and was in a house that was surrounded by armed law enforcement. Defendant and his fellow law enforcement [sic] quickly realized the shooting of Plaintiff was unjustifiable and so together falsely claimed that Plaintiff had a hammer and was coming at Defendant to strike him.

*A sham investigation into Plaintiff's killing followed. Although three separate organizations claimed to have done investigations, they all relied on the work of one investigator and worked to cover up the truth. During the sham investigation, not a single question was posed to the law-enforcement witnesses, including Defendant, about the shooting despite the fact that all non-law enforcement witnesses consistently stated that Plaintiff did not have a hammer. The detective assigned as lead investigator had never led a homicide investigation before and although he actually recommended a warrant for the arrest of Defendant, the request was rejected and he never inquired why.* There was no deadly weapon, the shooting was unjustified, excessive force, [sic] used in violation of Plaintiff's constitutional rights.

(ECF No. 180 at 1-2) (emphasis added). Defendant Quinn's Trial Brief contains the following as his theory of the case:

> On April 27, 2015, members of the Detroit Fugitive Apprehension Team ("DFAT") were searching for *a fugitive* named Terrance Kellom, who was a felon wanted on an arrest warrant for robbing a pizza deliveryman at gunpoint. That morning, the DFAT team learned that Terrance had visited his girlfriend the day before, had broken all of the windows on her car, and threatened to return to kill her and her mother. The DFAT team also learned that Terrance was likely staying at this father's house at 9543 Evergreen Road in Detroit.
>
> After one DFAT member observed Terrance exit and then reenter the house on Evergreen Road, the DFAT team approached the house to arrest him. During a search of the house, officers found Terrance hiding in a second floor attic crawl space. Because Terrance refused to comply with officer commands, was shouting at the officers, and was ripping up ductwork with a hammer, the

---

[1]The Estate's Trial Brief erroneously uses "Plaintiff" rather than Terrance Kellom throughout the Estate's theory of the case. Because the only plaintiff in this case is the Estate, its theory of the case should use "Decedent" or "Terrance Kellom" and not "Plaintiff."

officers requested back up as well as a taser and a shield. Defendant Mitchell
Quinn entered the house in response to the request for backup, and then he walked
toward a bedroom on the first floor. As he approached, Terrance dropped into the
first floor bedroom through a whole in the attic floor, and then Terrance ran at
Agent Quinn with the hammer raised above his head. Fearing for his safety and
the safety of others, Agent Quinn fired his handgun in self-defense, hitting
Terrance four times. Because his actions were objectively reasonable and justified
by the circumstances, Agent Quinn did not violate any constitutional rights.

(ECF No. 178 at 1-2) (emphasis added).

## ANALYSIS

The parties filed numerous motions in limine, that were fully briefed by the parties, and
were heard by the Court on August 19, 2019.

**I.    The Estate's Motions To Prohibit Certain Evidence Relating To The Decedent (ECF No. 135) And Motion To Prohibit Reference To The Name Of The Task Force (ECF No. 136)**

In the two motions filed as ECF Numbers 135 and 136, the Estate asks the Court to
preclude evidence of, or reference to, all of the following: 1) the Decedent's arrest warrant for
armed robbery; 2) the Decedent being on probation for a weapons offense; 3) evidence regarding
the Decedent making threats and breaking car windows the day prior to the incident; 4) the
Decedent's use of marijuana; 5) the Decedent's alleged relationship with Chevon Jones; and 6)
the name of the task force that was involved in the incident at issue.

As set forth below, no ruling is necessary at this time as to evidence of two issues (the
Decedent's alleged marijuana use and relationship with Ms. Jones) and the motion is DENIED in
all other respects.

### A.    The Decedent's Use Of Marijuana

The Estate seeks to preclude evidence of the Decedent's alleged use of recreational

marijuana.  (*See* caption of motion and Pl.'s Br. at 7 & 10).

In response to this issue, Quinn states that he does not oppose the request to preclude evidence of the Decedent's[2] alleged use of marijuana at this time, but reserves the right to revisit the issue depending upon how the proofs play out.

As such, no ruling on this issue is necessary at this time.

**B.      The Decedent's Alleged Romantic Relationship With Ms. Jones**

The Estate seeks to preclude Quinn from introducing any evidence or reference to the Decedent's alleged romantic relationship with Chevon Jones.

In response to this request, Quinn states that it would be premature to make a ruling as to this evidence.  Quinn states that he currently does not intend on introducing evidence of the Decedent's relationship with Jones during trial but states that could change, based on how the Estate proceeds at trial:

> At this time, Agent Quinn does not intend to introduce Terrance's relationship with Cheffon Jones during his rebuttal case.  However, that information could become relevant and admissible, for example, if Ms. Jones take the stand, because her relationship with Terrance is relevant to her credibility as a witness under Rule 607.  As another example, if plaintiff, or other witnesses called by plaintiff, manage to introduce improper character evidence of Terrance that he was a family man and loyal boyfriend, evidence of his relationship with Ms. Jones is relevant to rebut that notion.

(Def.'s Br. at 9).

As such, a ruling on this issue is not necessary at this time.

---

[2]Quinn notes that he contends that Kevin Kellom's drug use on the day of the incident is relevant and he does intend to introduce evidence regarding that.  The Estate's motion did not challenge evidence relating to Kevin Kellom's drug use.

**C.    The Decedent's Arrest Warrant For Armed Robbery, His Being On Probation, His Alleged Threats/Breaking Of Windows, And The Name Of The Task Force Involved In This Case**

The Estate also asks the Court to preclude evidence of, or reference to, the following: 1) the Decedent's arrest warrant for armed robbery; 2) that the Decedent was on probation on the date of the incident, for having carried a concealed weapon without a license; 3) testimony that Janay Williams and/or her mother told task force members that the Decedent had threatened them, and broken out car windows with a hammer, on the day before the incident; and 4) the name of the task force at issue (the Detroit Fugitive Apprehension Team). The Estate asserts that it brings this motion under Fed. R. Evid. 401, 402, 403, and 404(b), asserting this evidence is not relevant, is unduly prejudicial, and would be improper character evidence.

Quinn's brief notes that it is undisputed that on the date of the shooting: 1) the DFAT officers were looking for the Decedent because he was wanted on an arrest warrant for armed robbery and for a weapons offense; 2) the Decedent's girlfriend (Janay Williams) and her mother (Adrienne Williams) told DFAT officers that the Decedent had threatened to kill Adrienne because she would not let him stay at her house any longer, and that Janay informed them the Decedent had used a hammer to smash the windows of her car on the day before the incident. (*See* ECF Nos. 77 and 106 at ¶¶ 6-7 & 10).

Quinn asserts that evidence as to those facts, and the other facts the Estate wishes to exclude, is clearly relevant as to the totality of the circumstances that must be considered in determining if Quinn acted reasonably or used excessive force. That is, they are key components of the "totality of the circumstances" that the jury must consider in determining whether Quinn used excessive force on the date of the incident. The Court agrees.

Quinn is seeking to use this evidence for a proper purpose because it is relevant to the determination of whether he used excessive force. *See, e.g., Davis v. Nichols*, 191 F.3d 451, 1999 WL 777548 (6th Cir. 1999). To defend against the Estate's allegation of excessive force, Quinn seeks to demonstrate that his conduct was objectively reasonable in light of the facts and circumstances that confronted him. *Id.*

The reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene. *Graham v. Connor*, 490 U.S. 386, 394-95 (1989). The force used must be objectively reasonable in light of the particular facts and circumstances that confronted the officers. *Id.* Important considerations include the severity of the crime, whether the suspect poses an immediate danger to the officers or others, and whether the suspect is actively resisting arrest or attempting to flee. *Id.*

That the DFAT officers were aware that the Decedent had an arrest warrant for armed robbery and a weapons offense, and was on probation for a weapons offense, is clearly relevant to the facts and circumstances confronted by those officers, as it goes to the severity of the crime the Decedent was wanted for and whether he posed an immediate threat to the officers who were attempting to arrest him. The same is true of evidence that the officers had been advised that the Decedent had threatened to kill his girlfriend and her mother, and broken the windows out of her car with a hammer, the day just prior to the incident.

Quinn is not seeking to introduce evidence of the Decedent's conduct prior to the shooting as character evidence under Fed. R. Evid. 404. Rather, he is seeking to introduce this evidence to demonstrate that his conduct was reasonable in light of the facts and circumstances that confronted him on the day of the shooting. The evidence is admissible for this purpose.

*Davis, supra,* at *3.

The Court rejects the Estate's assertion that this evidence would be unfairly prejudicial under Rule 403. A district court's Rule 403 balancing is an evidentiary ruling that is reviewed for abuse of discretion. *United States v. Bonds*, 12 F.3d 540, 547 (6th Cir. 1993). "Unfair prejudice" does not mean the damage to a party's case "that results from the legitimate probative force of the evidence; rather it refers to evidence which tends to suggest decision on an improper basis." *Id.* Here, the evidence is clearly probative to the facts and circumstances with which Quinn was faced with and would not suggest a decision on any improper basis.

The Court shall also deny the Estate's request to preclude all references to the name of the task force that was involved in the incident.[3] The nature of that task force's work is also relevant as to the reasonableness inquiry. Moreover, as a practical matter, it would be nearly impossible for Quinn to provide a defense, and logically explain the sequence of events that occurred on the date of the incident, if the Court were to grant this request.

Accordingly, this motion is DENIED as to this evidence.

## II. The Estate's Motion To Prohibit Defendant Quinn From Using Media Footage (ECF No. 137)

In this motion, the Estate seeks to preclude Quinn from presenting or referencing news media coverage of this case, pursuant to Fed. R. Evid. 401 and 403 as not relevant and unfairly prejudicial. The Estate also seeks to preclude any statements made by reporters and media personalities as inadmissible hearsay.

In response, Quinn states that he "does not intend to present the commentary of news

_____

[3]The Court will, however, preclude Quinn's counsel from referring to Terrance Kellom as "a fugitive," as he seeks to do in his theory of the case.

anchors and journalists, which seems to be the thrust of" this motion. But he does intend to use various video clips as possible impeachment evidence, under Fed. R. Evid. 613(b), if any witnesses testify inconsistently with a prior statement. Quinn notes that after the shooting, several individuals listed on Plaintiff's witness list made statements about the incident to the media, Kevin Kellom in particular. Those video clips include videos of Kevin Kellom, wherein he makes statements about what happened on the day of the shooting. Quinn correctly notes that such evidence would not constitute hearsay if it is not being used for the truth of the matter asserted, but rather, for *impeachment purposes*.

To the extent that Plaintiff's motion asserts that the video clips are inadmissible because they would violate the confrontation clause of the Sixth Amendment, that argument is misplaced. As concisely explained in *Peretti,* "[b]y its own unequivocal terms, the constitutional right of confrontation applies only '[i]n *criminal* proceedings,' U.S. Const. amend. VI (emphasis added). It is, therefore, not applicable in the present administrative, ie., civil, context*." Peretti v. National Transp. Bd. F.A.A.*, 1993 WL 261883 (10th Cir. 1993) (citations omitted); *see also United States v. Parcel of Real Prop. Known as 6109 Grubb Rd.*, 886 F.2d 618, 621 (3d Cir. 1989).

The Court DENIES THIS MOTION WITHOUT PREJUDICE. If Quinn seeks to introduce such videos as impeachment evidence at trial, Plaintiff may raise a particularized 403 objection that shall be considered by the Court.

### III. The Estate's Motion To Preclude Evidence Of, Or Reference To, Teria Kellom's Disability Or Social Security Income (ECF No. 138) And Nelda Kellom's Bankruptcy (ECF No. 139)

Teria Kellom is the adult sister of the Decedent and she was present inside the house on

the date of the shooting. The Estate's motion states that Teria has a learning disability that entitles to her Social Security Disability benefits. In its motion filed as ECF Number 138, the Estate asks the Court to prohibit Defense Counsel and Defendants' witnesses from referencing Teria Kellom's disability or disability income.

In response, Quinn states that he does not oppose this motion at this time, but he reserves the right to revisit the issue at trial if the Estate opens the door by trying to bolster Teria's intelligence, recall, or credibility as a witness. That is, Defendant Quinn does not plan to reference Teria's learning disability during trial but reserves the right to address the issue if the Estate opens the door to that issue.

As such, no ruling is necessary at this time as to this first motion.

In its motion filed as ECF Number 139, the Estate asks the Court to prohibit Defense Counsel and Defendants' witnesses from referencing the bankruptcy of Nelda Kellom.

In response, Quinn states that he does not oppose this motion at this time but reserves the right to revisit this issue at trial, should the Estate open the door by discussing Nelda Kellom's motivations for filing this lawsuit or by discussing her finances. That is, Defendant Quinn does not plan to reference Nelda Kellom's bankruptcy during trial but reserves the right to address the issue if the Estate opens the door to that issue.

As such, no ruling on this second motion is necessary at this time.

## II.    Defendant Quinn's Motions Regarding Criminal Investigations Of Incident And Quinn's Assertion Of Fifth Amendment Rights

Two of Quinn's motions in limine relate to the state and federal investigations, that considered whether Quinn or others would face criminal charges related to the shooting, and

Quinn's assertion of his Fifth Amendment rights during those investigations. In the first motion, Quinn asks the Court to rule that investigative reports, that concluded Quinn acted in self defense, are not hearsay under Fed. R. Evid. 803(8). In the second motion, Quinn asks the Court to preclude the Estate's counsel from arguing that those investigations were botched or inadequate or reference that Quinn declined to be interviewed during them.

A.    **Motion Seeking Ruling That Law Enforcement Reports/Conclusions Are Not Inadmissible Hearsay Under Fed. R. Evid. 803(8) (ECF No. 132)**

In this motion, Defendant Quinn seeks a pretrial ruling that multiple law enforcement reports and conclusions are not inadmissible hearsay under Fed. R. Evid. 803(8). The specific exhibits that Quinn seeks this ruling as to are: Defendant's exhibits 6 through 11, 15 through 18, 20, 21, 33, and 34-49.

Notably, the Estate's response states that "Plaintiff does not object to Defendant's introduction of their Exhibits DTX-6 through DTX-11" but objects to the remaining exhibits. (ECF No. 152 at PageID.3603). Thus, the Court shall GRANT the motion as to Defendant's exhibits 6 through 11.

The Court will therefore consider Defendant Quinn's motion as to the remaining exhibits, which include: 1) DTX-16, "DHS-OIG Report of Investigation," a report that concludes that Quinn "using appropriate deadly force" fired his weapon in an attempt to stop Kellom, who had a "deadly weapon in his hands," and notes that both state and federal prosecutors declined to prosecute; 2) DTX-17, "DHS-OIG Summary of Search Warrant Activities," that discusses an investigator being able to verify facts set forth in witness statements; 3) DTX-18, Declination by U.S. Attorney's Office, a one-page document stating the U.S. Attorney reviewed the OIG's report

and findings of Wayne County Prosecutor and declines to prosecute Quinn; 4) DTX-21, a one-page form denying issuance of a warrant against Quinn for the reason "officer's use of force justified – self-defense/defense of others"; and 5) DTX 33 and 34-49, the Wayne County Prosecutor's Press Release and Powerpoint presentation, and individual slides from same, a lengthy document that concludes Quinn "acted in lawful self-defense."

Subsection (8) of Fed. R. Evid. 803 provides that "[t]he following are not excluded by the rule against hearsay, regardless of whether the declarant is available as a witness:"

> (8) Public Records.  A record or statement of a public office if:
>     (A) it sets out:
>         (I) the offices's activities;
>         (ii) a matter observed while under a legal duty to report, but not including, in a criminal case, a matter observed by law-enforcement personnel; or
>         (iii) in a civil case or against the government in a criminal case, factual findings from a legally authorized investigation; and
>     (B) the opponent does not show that the source of information or other circumstances indicate a lack of truthworthiness.

Fed. R. Evid. 803(8).

Defendant Quinn's motion states that "Federal Rule of Evidence 803(8) states that a 'record or statement of a public office' is not hearsay if it sets out 'factual findings from a legally authorized investigation" and "the opponent does not show that the source of information or other circumstances indicate a lack of trustworthiness."  (Def.'s Br. at 3).  Thus, Quinn is seeking a ruling as to these challenged exhibits under Fed. R. Evid. 803(8)(A)(iii).

The Estate opposes this motion, as to the exhibits referenced above, and asserts that the investigative reports lack trustworthiness.

Under Rule 803(8), "evaluative reports which contain inferences drawn from the

evidence as factual findings" may be admissible. *In re Complaint of Paducah Towing Co., Inc.*, 692 F.2d 412, 420 (6th Cir. 1982). Such reports will be inadmissible if "the sources of information or other circumstances indicate a lack of trustworthiness." *Id.*

In the Sixth Circuit, to determine whether a report is trustworthy, courts consider: 1) the timeliness of the investigation upon which the report is based; 2) the special skill or experience of the investigators; 3) whether the agency held a hearing; and 4) possible motivational problems. *Alexander v. Caresource*, 576 F.3d 551, 563 (6th Cir. 2009). "This list of factors is not exclusive; any circumstance which may affect the trustworthiness of the underlying information, and thus, the trustworthiness of the findings, must be considered when ruling upon the admissibility of factual findings under this rule." *In re Complaint of Paducah Towing Co., Inc.*, 692 F.2d at 420.

"The trustworthiness of a factual finding is often a function of the trustworthiness of the information upon which the finding is based." *Id.* For example, "[s]everal courts have indicated that factual findings, which are based on inadmissible hearsay, are not admissible under Rule 803(8)(C) because the underlying information is untrustworthy." *Id.*

Here, soon after the April 27, 2015 shooting, the Michigan State Police, the Detroit Police Department, and the Office of Inspector General for the Department of Homeland Security conducted a joint investigation. No hearings were held in connection with those investigations. Nevertheless, those investigations resulted in several reports, overall conclusions, and prosecutorial declinations by the Wayne County Prosecutor's Office and the United States Attorney's Office.

It is undisputed that those investigations were considering whether any of the DFAT

officers, including Defendant Quinn, had engaged in criminal conduct on the date of the incident. As is his Fifth Amendment right to do so, Defendant Quinn declined to be interviewed during those investigations. "In lieu of an interview," Quinn provided a written statement to investigators. (*See* ECF 134 at PageID.3426). Other DFAT officers that witnessed the shooting, including Fitzgerald, did likewise. Thus, none of the officers who witnessed the shooting were interviewed in connection with the investigations. Rather, they gave written statements prepared by them and/or their counsel.

As such, these investigative reports were not based on interviews with the officer involved in the shooting or the other officers who witnessed the shooting. They were based on witness statements that these officers, whose own conduct was being evaluated to determine if criminal charges were warranted, drafted and provided to the investigators.

Moreover, Fitzgerald's investigation statement appears to have been in line with his police report, that stated that the Decedent had a hammer in his raised hands and going to strike Quinn. (*See* ECF No. 132-2 at PageID.3198) ("Fitzgerald's statement indicated he was positioned behind Quinn when Kellom moved toward Quinn with the claw hammer raised above his head. Fitzgerald believed Kellom was going to use the hammer to strike him or Quinn, as Fitzgerald drew his service firearm in defense."). Fitzgerald's deposition testimony in this action, however, could be construed as contradicting the statements he made in his investigation statement:

> Q.   Okay.  Did there come a time where you seen Terrance Kellom?
> A.   Yes, there was.
> Q.   Okay.  When was that, sir?
> A.   *That was after first couple of shots. That's when I saw him.*
> . . . .

Q. So you, you hear a couple shots? I'm sorry, I'm not trying to put words in your mouth, but you heard a couple shots first and then you seen Terrance Kellom?

A. Yes.

. . . .

Q. So when you first seen him where were you standing, Officer Fitzgerald?

A. When I first saw – you got the, the diagram?

Q. Yes, sir. And I'm going to show you the – it's number six on the deposition of Ms. – Officer Eaton but we can use it as well here too.

A. Where's the front door. Oh, right here. I saw – I finally saw Terrance when he was on his knees almost in the front of the, the door, door frame here – witness indicating –

. . . .

Q. Okay. And when you first observed Terrance Kellom, was he still standing, was he on his knees; what, what did you observe?

A. *He was on his knees when I saw him.*

Q. Okay. And when he was on his knees, *did you see him holding anything?*

A. *No, I did not.*

Q. And did you see him fall forward?

A. Yes.

Q. To the ground?

A. Yes, I did.

Q. Okay. *Now after you seen him fall forward to the ground did you see anything in his hands then?*

A. *No, I didn't.*

Q. *Or anything near his hand?*

A. *No.*

Q. *So I want to take you to again your statement of Exhibit F-2. Did you ever see Terrance Kellom with a hammer in his hand?*

A. *No.*

Q. Is there any reason why, sir, that you said in this statement when I – quote, when I turned around towards the hallway, I could see Terrance with hammer raised above his shoulder and I believed he was about to strike myself and TFO Quinn. Is there any reason why you made that statement, sir, on 4-29-2015?

A. Yes, I do see it.

Q. Okay. So which is it, sir, did he have a hammer or did he not have a hammer?

A. Well, my statement said that he had a hammer, the one that wrote down or it was taken on the 29th.

Q. But today as you sit here, you're under oath, sir, do you remember him having a hammer?

A. That was without, like I say, recollection of this, like I say, so . . .

16

Q.      So your testimony today, sir, again you're under oath, Officer –

A.      Correct.

Q.      – Fitzgerald, do you remember Terrance Kellom having a hammer in his hand or not?

A.      Well, like I say, I couldn't recollect if he had a, a hammer in his hand.

Q.      I want to take you to Exhibit 7 of the Eaton deposition. And this is the title, Darrell Fitzgerald and Trevor Eaton's Responses to Plaintiff's First Set of Interrogatories and Request for the Production of Documents. *And in answer to question number 19 and 20, number 19 says, did you see the victim, Mr. Kellom, wielding a hammer at any time during the incident? It says that Defendant, Darrell Fitzgerald, did not personally observe plaintiff wielding a hammer from his vantage point, but was informed that it was the case following the incident.*

        So again this document, which was on January of 2018, about 10 months ago, *you said he didn't have a – you didn't see a hammer in his possession, in his hand – in , in holding a hammer; is that correct?*

A.      *Correct.*

Q.      *And you also – did you see the victim was found with a hammer immediately after he was shot? Your answer was, Darrell Fitzgerald did not personally observe plaintiff with a hammer from the vantage point, but was informed that was the case following the incident.*
        *Again so you did not see a hammer in his hand; is that correct, --*

A.      *Correct.*

Q.      – agent? I mean officer, I'm sorry.
        *Did you see Agent Quinn shoot – no. Did you see Agent Quinn's – any of Agent Quinn's shooting of Mr. Kellom?*

A.      *No, I didn't.*

Q.      Did you know whether there was any officers or agents around Mr. Kellom when the shooting took place?

A.      Were there any other officers?

Q.      Yes.

A.      No.

Q.      Do you know whether anyone was in the bathroom or on the stairs or anything of that nature?

A.      That I don't know.

Q.      *Did you see any hammer that evening at the house?*

A.      *No.*

(Fitzgerald Dep. at 23-28) (emphasis added).[4]

_____

        [4]When examined by his own counsel, Defendant Fitzgerald testified that his memory of the events was a little hazy and that he would not have put anything in his report if it was not true or accurate. (Fitzgerald Dep. at 40-45).

Accordingly, the Court finds that the Estate has met its burden of showing that, as to these challenged investigative reports, the source of information or other circumstances indicate a lack of trustworthiness. Thus, Quinn's motion seeking a pretrial ruling that the above-noted challenged reports are not inadmissible hearsay under Fed. R. Evid. 803(8) is DENIED.

## B.     Quinn's Motion Regarding His Previous Assertion Of His Fifth Amendment Rights (ECF No. 134)

It is undisputed that there were state and federal investigations as to the shooting that is the subject matter of this civil action, to determine whether Quinn or others should be criminally charged in connection with the shooting. During those criminal investigations, Defendant Quinn exercised his Fifth Amendment rights and declined to be interviewed. Quinn, and the other DFAT officers, however, were deposed in this civil action and did not decline to answer any questions.

In this motion, Defendant Quinn asks the Court to protect his previous assertion of Fifth Amendment rights during the criminal investigations and preclude "plaintiff's counsel from arguing or implying at trial that Agent Quinn should have been interviewed, and that the investigation was 'botched and incompetent' because he was not interviewed." (Def.'s Br. at 1).

Quinn's motion does not cite any cases that directly address this issue – whether a person who exercises his Fifth Amendment rights in connection with a criminal investigation can preclude that from being presented to a jury in a subsequent civil case in which he *does not* invoke his Fifth Amendment rights and submits to a full deposition and testifies at trial.

The Estate's brief does not direct the Court to any on-point authority either. Rather, it directs the Court to cases stating that a negative inference can be drawn when a person declines to testify in a civil case. But Quinn *has not* asserted his Fifth Amendment rights in this civil

case. He was deposed in this action and will testify at trial.

While this Court has not found any cases that address this unique situation, it concludes that the Estate should be precluded from referring to Quinn's declining to be interviewed in the criminal investigations.

"A trial court must carefully balance the interests of the party claiming protection against self-incrimination and the adversary's entitlement to equitable treatment. Because the privilege is constitutionally based, the detriment to the party asserting it should be no more than is necessary to prevent unfair and unnecessary prejudice to the other side." *SEC v. Graystone Nash, Inc.*, 25 F3d 187, 192 (3d Cir. 1994).

Here, it is undisputed that Quinn had a Constitutional right to decline to be interviewed during the criminal investigations. The sole issue at trial in this case is whether Quinn used excessive force when he shot Terrance Kellom. Whether Quinn exercised his Constitutional right not to be interviewed in connection with the later criminal investigation of the shooting is of marginal relevance at best. It would be fundamentally unfair to allow the Estate to reference, in this civil action, Quinn's having exercised that Constitutional right in the prior criminal investigations. That is especially so given that Quinn *has not* claimed a privilege against self-incrimination in this civil case. The Court GRANTS this motion and rules that the Estate's Counsel is precluded from arguing or implying at trial that Quinn should have been interviewed during the criminal investigations, or that the investigations were "botched" or incompetent, because he was not interviewed.

## V.    Defendant Quinn's Motion To Preclude Prior Alleged Wrongful Acts By Him (ECF No. 129)

In this motion, Quinn seeks to preclude the Estate from admitting evidence regarding any

prior alleged wrongful acts by Quinn, under Fed. R. Evid. 401, 403, 404(b).  His motion states

that "[s]even years prior to the incident, Agent Quinn was employed as a Detroit police officer.

During that period, he faced several unsubstantiated complaints relating to issuing traffic tickets,

making arrests, and other subjects unrelated to the incident at issue in the upcoming trial.

Plaintiff has focused on these past allegedly wrongful acts during discovery.  Accordingly, Agent

Quinn respectfully requests that the Court exclude such evidence as irrelevant, unfairly

prejudicial, and as inadmissible character evidence."  (Def.'s Br. at 1).

Quinn argues that such evidence should not be admitted under Rule 404(b): "Here, Rule

404 bars plaintiff from offering evidence of Agent Quinn's allegedly wrongful past conduct.

This information has no bearing on the sole issue remaining for trial and could only be offered as

impermissible character evidence.  Therefore, the Court should exclude this evidence under Rule

404."  (Def.'s Br. at 4).

In response to this motion, the Estate appears to assert that it will attempt to introduce

evidence regarding past alleged conduct by Quinn.  The Estate asserts, without further

explanation, that it intends to offer evidence as to some prior, unspecified, incident:

> [A]llegations involving poor judgement [sic] with firearms when under high stress
> could not be more relevant here. Under Fed. R. Civ. P. 404(b)(2) allows
> admission of prior wrongful acts evidence when it directly relates to the
> allegations in the current litigation.  "This evidence may be admissible for another
> purpose, **such as** proving motive, opportunity, intent, preparation, plan,
> knowledge, identity, absence of mistake, or lack of accident."  *Id.* (emphasis
> added).  In this instance, the prior bad act of Defendant at issue here involves the
> exact same behaviors by Defendant (the drawing and pointing of a pistol at
> someone) under circumstances similar in that Defendant was in high-emotion,
> high-adrenaline, stress.

(Pl.'s Br. at 2).

As this Court explained in *Edgerson v. Matatall*, 2014 WL 172258 (E.D. Mich. 2014) a

Rule 404(b) inquiry consists of three parts:

> First, the trial court must make a preliminary determination as to whether sufficient evidence exists that the prior act occurred. Second, the district court must make a determination as whether the 'other act' is admissible for a proper purpose under Rule 404(b). Third, the district court must determine whether the 'other acts' evidence is more prejudicial than probative under Rule 403." *United States v. Mack,* 258 F.3d 548, 554 (6th Cir.2001); *see also Flagg,* 715 F.3d at 176.

In *United States v. Merriweather,* 78 F.3d 1070 (6th Cir.1996), the Sixth Circuit set forth the proper procedure for a making a Rule 404(b) determination:

> Upon objection by the defendant, the proponent of the evidence, usually the government, should be required to identify the *specific* purpose or purposes for which the government offers the evidence of "other crimes, wrongs, or acts." By so requiring, we do not mandate hyper technicality. It is true that whether 404(b) evidence is admissible for a particular purpose will sometimes be unclear until late in the trial because whether a fact is "in issue" often depends on the defendant's theory and the proofs as they develop. Nevertheless, the government's purpose in introducing the evidence must be to prove a fact that the defendant has placed, or conceivably will place, in issue, or a fact that the statutory elements obligate the government to prove.
>
> After requiring the proponent to identify the specific purpose for which the evidence is offered, the district court must determine whether the identified purpose, whether to prove *motive* or *intent* or *identity* some other purpose, is "material"; that is, whether it is "in issue" in the case. If the court finds it is, the court must *then* determine, before admitting the other acts evidence, whether the probative value of the evidence is substantially outweighed by the danger of unfair prejudice under Rule 403. If the evidence satisfies Rule 403, then, after receiving the evidence, the district court must "clearly, simply, and correctly" instruct the jury as to the *specific* purpose for which they may consider the evidence. *Johnson,* 27 F.3d at 1193.

*Id.* at 1076–77 (emphasis in original).

For each 404(b) challenge, the Court must consider: 1) whether there is sufficient evidence the prior act occurred; 2) whether there is a proper purpose for the evidence; and 3) whether the evidence is more prejudicial than probative.

*Id*. at * 2-3.

Here, the Estate's response appears to indicate that it may seek to admit some evidence

regarding some prior conduct by Quinn, that will require a 404(b) analysis by the Court.  But the Estate's response does not go through the analysis, or even specify the evidence it may seek to admit at trial.

This Court typically addresses 404(b) challenges during the court of trial.  Given the Estate's response, the Court cannot conduct a proper 404(b) analysis as to any evidence of prior alleged conduct by Quinn.  As such, the Court shall GRANT THIS MOTION WITHOUT PREJUDICE such that the Estate's Counsel is precluded from offering any evidence regarding, or making any references to, prior bad acts by Quinn.  If during the course of trial, the Estate wishes to admit such evidence, Counsel for the Estate may so advise the Court so that the Court can conduct a proper 404(b) analysis out of the presence of the jury.

## VI.  Quinn's Motion To Preclude Evidence Of, Or References To, Unrelated Alleged Law Enforcement Misconduct (ECF No. 130)

In this motion, Defendant Quinn seeks to preclude evidence or reference to alleged law enforcement misconduct not involving him and that are unrelated to this incident.  He asserts that any other officer-involved shootings in other jurisdictions around the county are irrelevant as to the Estate's claim in this case.  Quinn asks the Court to preclude Plaintiff's Counsel from referencing or producing evidence of officer-involved shootings that are unrelated to this case.  In support of his motion, Quinn asserts:

> "Unrelated allegations and incidents of police misconduct possess minimal—if any—probative value while carrying a great risk of prejudice to police officers." *Martin v. City of Chicago*, No. 15-CV-04576, 2017 WL 2908770, at *6 (N.D. Ill. July 7, 2017) (barring plaintiff from mentioning during trial "police misconduct unrelated to the present case, including highly publicized incidents such as the deaths of Michael Brown and Laquan McDonald."). Therefore, many courts have excluded evidence and argument referring to unrelated officer involved shootings. *See, e.g. Ochana v. Flores*, 199 F. Supp. 2d 817, 831 (N.D. Ill. 2002), *aff'd*, 347 F.3d 266 (7th Cir. 2003) ("The court finds that any reference to recent publicized events concerning allegations of police

misconduct would be unduly prejudicial, as it would distract the jury's attention from the conduct at issue."); *Sturm v. Hedges*, No. 114CV00848MPBRLY, 2017 WL 11001656, at *6 (S.D. Ind. June 21, 2017) ("The Court finds that evidence of police conduct, which is unrelated to Officer Hedges's case has only minimal probative value and is highly inflammatory and prejudicial.").

Here, any evidence or argument relating to unrelated officer-involved shootings, or to the Black Lives Matter movement or similar related issues, would be irrelevant, unfairly prejudicial, and improper character evidence. There is no claim in this case regarding nationwide police practices or training. The only claim left for trial in this case is whether Agent Quinn acted reasonably when he shot Terrance Kellom in self-defense under the particular circumstances in the house that day. Therefore, there is no factual or legal connection between the nationally reported incidents and this case. Any mention of those incidents, each of which has triggered strong public reactions, could only unfairly prejudice Agent Quinn.

(Def.'s Br. at 4-5).

In response, Plaintiff's Counsel asserts that he "does not intend to argue, mention, or elicit mention of specific police shootings" he nevertheless: 1) wants "to reserve" the right to ask the investigator in charge of this investigation why he was chosen to investigate this shooting; and 2) asserts "the state of public opinion regarding police shootings is relevant and admissible under the Federal Rules of Evidence." (Pl.'s Br. at 2). Thus, it appears that Plaintiff's Counsel does intend to make references to other unrelated shootings by police officers, or public opinions regarding same. He also wants to present evidence relating to why Sanchez was chosen to investigate this shooting.

The Court GRANTS this motion. The Court agrees with Quinn that such evidence, and references to it, is irrelevant to the sole excessive force claim that is preceding to trial. Defendant Quinn did not investigate the shooting and there are no claims relating to the investigation that are proceeding to trial in this case. Why Sanchez was chosen to investigate the shooting, after it occurred, is irrelevant as to whether or not Quinn used excessive force or acted reasonably in the circumstances he faced prior to the shooting. Such evidence shall be PRECLUDED.

In addition, any evidence of, or reference to, unrelated shootings by police officers in other cases or jurisdictions would be irrelevant to the sole claim being presented to the jury in this case – whether Quinn used excessive force in the particular circumstances that existed here. Thus, the Court also PRECLUDES the Estate's Counsel from presenting evidence of, or referencing at trial, any unrelated shootings by police officers. That would include making references to public opinion on movements such as "black lives matter" or "blue lives matter."

## VII.    Defendant Quinn's Motion To Exclude Opinions Of David E. Balash (ECF No. 131)

In this motion, Quinn seeks to exclude several opinions of the Estate's expert, David D. Balash, pursuant to Fed. R. Evid. 401, 403, and 702.

The Estate wishes to have Balash testify as an expert witness at trial. Pursuant to Fed. R. Civ. P. 26(a)(2)(B), the Estate provided Quinn with a written report that is attached to Quinn's motion as Exhibit 1.

"Under Rule 26(a), a 'report must be complete such that opposing counsel is not forced to depose an expert in order to avoid an ambush at trial; and moreover the report must be sufficiently complete so as to shorten or decrease the need for expert depositions and thus to conserve resources.'" *R.C. Olmstead, Inc. v. CU Interface, LLC,* 606 F.3d 262, 271 (6th Cir. 2010) (citation omitted); *see also* Fed. R. Civ. P. 26(a)(2)(B) (noting an expert report must contain "a complete statement of all opinions the witness will express and the basis and reasons for them" and "the facts or data considered by the witness in forming them."). Such expert reports must include how and why the expert witness reached a particular opinion, "not merely the experts' conclusory opinions." *R.C. Olmstead, Inc., supra*, at 271.

Here, Balash's Report includes his Curriculum Vitae and a list of prior cases in which he has provided testimony. The portion of Balash's Report that is specific to this case consists of

four pages.  It begins by listing the materials that he considered, including Quinn's statement and the autopsy report.  Balash's Report then contains the following sections.  First it contains a section titled "Qualifications for Opinion" wherein he discusses his background and experience.  Second, it contains a section titled "Information" wherein Balash summarizes the versions of events as reflected in Quinn's statement and police reports.  Third, it contains a section titled "Comments and Observations" that has several bullet points including, but not limited to, the following:

    \*       Mr. Kellom suffered four (4) bullet strikes and all four are from different angles as well as directions.  The autopsy protocol lists GSW #1 entering on the anterior base of the next 12 inches below the top of the head and travels from front to back, left to right and downward.  GSW #2 enters the anterior left shoulder (virtually the top of the shoulder) 9 3/4 inches below the top of the head and 5 3/4 inches left of midline and travels left to right and downward.  GSW #3 enters the lower right back 23 ½ inches below the top of the head and 6 inches right of midline (posterior) and this bullet travels back to front, right to left and upward where the bullet nearly exits the victim 22 inches below the top of the head and 2 inches right of midline.  GSW #4 enters the lateral right thigh 38 inches above the heel and exits the right inguinal (inner thigh) 38 inches above the heel and exits the right inguinal (inner thigh as I view the photo) 37 inches above the heel.  The wound tract is from back to front, right to left and downward.  Agent Quinn stated that Mr. Kellom charged at him and that he fired while retreating and falling with Mr. Kellom falling toward him (facedown) on the floor.  The evidence and the account of the shooting to not correlate.

    \*       The fired cartridge cases are distributed throughout the living room area, however, there are fired cartridge cases in the hallway, bathroom and on one of the closet shelves as well.  Did investigators determine why the fired cartridge cases were found in such different locations given the account of the shooting being offered by Agent Quinn?

    . . . .

    \*       The blood spatter patterns observed on the walls were not explained with the story of how the shooting took place.

(Balash Report at Comments and Observation Section).

Finally, Balash's Report contains a section titled "Opinions and Conclusions" that states as follows:

> Mr. Kellom was struck by four (4) fired bullets, all entering his body from four (4) different directions and angles making the account of the shooting given by Agent Quinn and other members of the team inconsistent with the evidence.
>
> Then, when considering the location of the fired cartridge cases as the scene, specifically the one in the bathroom and the one on the closet shelf, the shored bullet exit wound from GSW #3, the lack of any examination of the clothing for firearms discharge residue and the missing item #8 or the listing of what happened to this item requires that the version of the shooting given by Agent Quinn and other team members should have been to be [sic] more thoroughly examined by investigators in this examiner's opinion.
>
> The undersigned reserves the right to modify or change any of the opinions expressed in this report if previously unreviewed evidence or reports become available for review. The undersigned also requested to actually visit the scene to observe firsthand the immediate area of the shooting.

(ECF No. 131-1).

Quinn's motion seeks to exclude the opinions of Balash under Fed. R. Evid. 401, 403 and 702. Quinn's motion divides the opinions in the Balash Report into three categories: 1) alleged opinions "on forensic pathology (e.g., the path of bullets through Terrance Kellom's body)"; 2) criticisms concerning the scope and thoroughness of the investigation following the shooting; and 3) opinions as to "the crime scene (e.g., bullet trajectories and blood spatter analysis)." (Def.'s Br. at 5).

### A.    Criticisms Of The Investigation Following The Shooting

There are no claims concerning the adequacy of the post-shooting investigation remaining in this case and Defendant Quinn played no role in conducting that investigation. Any opinions regarding the scope or thoroughness of the investigation, that occurred after the shooting, are irrelevant to the issue of whether Quinn used excessive force when he shot the

Decedent and shall be EXCLUDED under Fed. R. Evid. 401.

**B.      Balash's Opinions On Forensic Pathology**

Quinn's motion asserts that in his report "Balash offers several opinions on the path of the bullets through Terrance's body." (Def.'s Br. at 6). Quinn asserts that "[t]hese opinions should be excluded in their entirety as unreliable, because Mr. Balash has no training, education, or experience to qualify him in forensic pathology." (*Id.*).

While the Estate's response does not argue this, the Court does not believe the Balash's Report is offering any opinions by him as to forensic pathology. That is, Balash is not offering any of *his own* opinions as to the path of the bullets through the Decedent's body. Rather, he appears to offer his opinion that the account of how the shooting occurred given by Quinn (that Quinn shot the Decedent while Quinn was retreating and the Decedent fell towards him with his face towards the floor) is not consistent with the crime scene evidence. In support of that opinion, Balash notes, as the facts considered by him that support that opinion, the statements in the autopsy report (that was authored by a forensic pathologist) as to the path the four bullets took through the Decedent's body.

As Balash is not seeking to offer any of his own opinions as to the paths the bullets took through the Decedent's body, it appears unnecessary for the Court to exclude any such "expert opinions" by Balash.

**C.      Comments On The Crime Scene**

That leaves the final category of Balash's expert opinions, those that relate to the crime scene. Quinn's motion asserts that Balash's opinions about the crime scene should be limited to those expressly stated in his report. (Def.'s Br. at 10). Quinn assert that:

In this case, Mr. Balash should be limited to testifying that the shell casings were

distributed around the house, and that there was blood spatter patterns on the walls. (*See* Ex. 1, P. 16, second and third bullet points). Mr. Balash should not be permitted to explain the relevance of the locations of the shell casings or the blood spatter patterns, (*see id.*), and he should not be permitted to answer his own question posed: "Did investigators determine why the fired cartridge cases were found in such different locations. . .", because he offered no opinions on those issues in his report. (*See id.*).

(Def.'s Br. at 12).

The Court finds that is placing form over substance. Balash's Report opines that Quinn's version of the how the shooting occurred is inconsistent with the crime scene evidence. Although the second bullet point in his report is *phrased as a question*, and also infers the investigation was inadequate, the Court believes it also gave Defense Counsel notice that Balash is of the opinion that Quinn's account of how the shooting occurred is inconsistent with the crime scene evidence because there would not have been fired cartridges in other areas of the house if it occurred as Quinn says it did.

It is similarly apparent from his Report that Balash is of the opinion that the blood spatters are inconsistent with Quinn's version of how the shooting occurred. ("The blood spatter patterns observed on the walls were not explained with the story of how the shooting took place."). The Court agrees with Quinn, however, that the report does not explain, in any way, even in the form of question, why or how the blood patterns are inconsistent with Quinn's version of how the shooting occurred. As such, the Court concludes that Balash should be precluded from offering that opinion at trial or explaining the relevance of the blood spatter patterns that were found at the scene.

## IX. Defendant Quinn's Motion To Preclude Reference To Dismissed Or Unpled Claims (ECF No. 133)

Again, the dismissed claims, previously asserted by the Estate and the Decedent's

relatives in this case, include: 1) excessive force claims against Eaton and Fitzgerald under *Bivens* and § 1983; 2) conspiracy claims under § 1985 and *Bivens*; 3) a wrongful death claim under Michigan law; 4) a claim for intentional infliction of emotional distress under Michigan law; 5) a *Steagald claim*, asserting that the officers' entry into the home was unlawful; and 6) a *Monell* municipal liability claim. In the now-dismissed conspiracy counts, the Plaintiffs asserted that the Defendants conspired to cover up the facts and circumstances surrounding the shooting.

In this motion, Quinn asks the Court "to bar plaintiff, former plaintiffs, and their counsel from offering evidence or statements about unpled or previously-dismissed claims" pursuant to Fed. R. Evid. 401, 402, and 403. His motion states: "Earlier in this litigation, plaintiff and former plaintiffs had asserted claims alleging that other law enforcement officers and Agent Quinn unlawfully entered the home of Kevin Kellom, as well as claims that other law enforcement officers conspired to fabricate evidence. The Court dismissed those claims prior to trial. Accordingly, evidence or argument relating to those claims is not relevant to the sole remaining issue for trial and is likely to unfairly prejudice Agent Quinn, cause undue delay, and confuse the jury." (Def.'s Br. at 1).

In response, the Estate asserts it "does not intend to argue that there was a legal conspiracy against Terrance Kellom. What Plaintiff intends to argue, and must be allowed to argue, is that there was a perfunctory and perhaps wilfully negligent homicide investigation . . ." (Pl.'s Br. at 4).[5]

The adequacy of the state and federal criminal investigations that occurred after the shooting, and the conclusions reached in those investigations, *is not* relevant as to the sole

---

[5]While the Estate's brief appeared to argue otherwise, at the hearing, Counsel for the Estate agreed that no evidence regarding the dismissed *Steagald* claim would be relevant at trial.

excessive force claim that is proceeding to trial.

This motion is GRANTED and Counsel for the Estate may not make reference to any dismissed claims. And again, Counsel for the Estate may not present evidence, or make any statements or assertions, regarding the adequacy of the investigation that occurred after the shooting.

## CONCLUSION & ORDER

For the reasons explained above, the Court **ORDERS** that:

1)  Although no ruling is necessary at this time as to evidence of the Decedent's drug use or relationship with Ms. Jones, the Estate's motions filed as ECF Number 135 and 136 are DENIED in all other respects;

2)  The Estate's Motion to Prohibit Quinn from using Media Footage (ECF No. 137) is DENIED WITHOUT PREJUDICE. If Quinn seeks to introduce such videos as impeachment evidence at trial, Plaintiff may raise a particularized 403 objection that will be considered by the Court;

3)  No rulings are necessary as to the Estate's motions filed as ECF No. 138 and 139 because Quinn does not currently plan to reference Teria Kellom's learning disability, or Nelda Kellom's bankruptcy, at trial but reserves the right to address those issues if the Estate opens the door to them;

4)  Defendant Quinn's motion filed as ECF No. 132 is GRANTED IN PART AND DENIED IN PART. The motion is GRANTED to the extent that the Estate does not object to the introduction of Quinn's Exhibits DTX-6 through DTX-11. The motion is DENIED in all other respects;

5)  Quinn's Motion Regarding Previous Assertion of Fifth Amendment Rights (ECF No. 134) is GRANTED and Plaintiff's Counsel is precluded from arguing or implying at trial that Quinn should have been interviewed during the criminal investigations;

6)  Quinn's Motion To Preclude Prior Alleged Wrongful Acts By Him (ECF No. 129) is GRANTED WITHOUT PREJUDICE. Counsel for the Estate is currently precluded from offering evidence regarding, or making any references to, prior bad acts by Quinn. However, if during the course of trial, the Estate wishes to admit such evidence for a proper purpose under Fed. R. Evid. 404(b), Counsel for the Estate may so advise the Court so that the Court may conduct a proper 404(b) analysis out of the presence of

the jury;

7) Quinn's Motion to Preclude Evidence Of, Or References To, Unrelated Alleged Law Enforcement Misconduct (ECF No. 130) is GRANTED;

8) Quinn's Motion To Exclude Opinions Of David E. Balash (ECF No. 131) is GRANTED IN PART AND DENIED IN PART. The motion is GRANTED to the extent that: 1) Balash may not offer any opinions regarding the scope or thoroughness of the criminal investigations of the shooting; and 2) Balash may not offer opinions as to the blood spatters. The motion is DENIED to the extent that Balash may offer opinions, as set forth in his report, that Quinn's account of how the shooting occurred is inconsistent with the crime scene evidence because of the location of the fired cartridges;

9) Quinn's Motion to Preclude References To Dismissed Or Unpled Claims (ECF No. 133) is GRANTED.


IT IS FURTHER ORDERED that, within seven days of this Opinion & Order, each party

shall submit a revised theory of its case, given the above rulings.

IT IS SO ORDERED.

s/Sean F. Cox
Sean F. Cox
United States District Judge


Dated: September 4, 2019